JOHNSON ET AL. *v.* MAYOR AND CITY COUNCIL OF
BALTIMORE ET AL.

No. 84–518.   Argued April 22, 1985—Decided June 17, 1985*

*Together with No. 84–710, *Equal Employment Opportunity Commission* v. *Mayor and City Council of Baltimore et al.*, also on certiorari to the same court.

MARSHALL, J., delivered the opinion for a unanimous Court.

*Solicitor General Lee* argued the cause for petitioners in both cases. With him on the briefs for petitioner in No. 84–710 were *Deputy Solicitor General Wallace, Alan I. Horowitz, Johnny J. Butler,* and *Vella M. Fink. William H. Engelman, Harriet E. Cooperman,* and *Paul D. Bekman* filed a brief for petitioners in No. 84–518.

*L. William Gawlik* argued the cause for respondents in both cases. With him on the brief were *Benjamin L. Brown* and *Ambrose T. Hartman.*†

---

†*Alfred Miller* and *Steven S. Honigman* filed a brief for the American Association of Retired Persons urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of New York by *Robert Abrams,* Attorney General, *Robert Hermann,* Solicitor

Justice Marshall delivered the opinion of the Court.

The issue is whether a federal statute generally requiring federal firefighters to retire at age 55 establishes, as a matter of law, that age 55 is a bona fide occupational qualification (BFOQ) for nonfederal firefighters within the meaning of the Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.* (ADEA or Act).

I

Congress enacted the ADEA "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U. S. C. § 621(b). To this end, the Act today prohibits virtually all employers from discriminating on the basis of age against employees or applicants for employment who are between the ages of 40 and 70 by, for example, discharging them or requiring them to retire involuntarily. §§ 623(a), 631(a). The Act contains one general exception to this prohibition: when age is shown to be "a bona fide occupational qualification reasonably necessary to the normal operation of the par-

General, and *Harvey M. Berman,* Assistant Attorney General; for the State of Vermont by *Jeffrey L. Amestoy,* Attorney General, and *J. Wallace Malley, Jr.,* Assistant Attorney General; for the National Association for Rights Protection and Advocacy et al. by *Steven J. Schwartz, David Ferleger, David Shaw, Paul Jameson, Daniel Stormer,* and *Nonnie S. Burnes;* and for the National League of Cities by *Frederick Simpich.*

A brief for the Commonwealth of Massachusetts et al. as *amici curiae* was filed by *Francis X. Bellotti,* Attorney General of Massachusetts, *H. Reed Witherby* and *Thomas A. Barnico,* Assistant Attorneys General, and by the Attorneys General of their respective States as follows: *David L. Armstrong* of Kentucky, *LeRoy S. Zimmerman* of Pennsylvania, *Linley E. Pearson* of Indiana, *William J. Guste, Jr.,* of Louisiana, *Edwin Lloyd Pittman* of Mississippi, *William L. Webster* of Missouri, *Irwin I. Kimmelman* of New Jersey, *Anthony Celebrezze, Jr.,* of Ohio, and *W. J. Michael Cody* of Tennessee.

ticular business," § 623(f)(1), an employee may be terminated on the basis of his age before reaching age 70.[1]

Since enacting the ADEA in 1967, Congress has amended its provisions several times. The ADEA originally did not apply to the Federal Government, to the States or their political subdivisions, or to employers with fewer than 25 employees, but in 1974 Congress extended coverage to Federal, State, and local Governments, and to employers with at least 20 workers. §§ 630(b), 633a.[2] Also, while the Act initially covered employees only up to age 65, in 1978 Congress raised the maximum age to 70 for state, local, and private employees and eliminated the cap entirely for federal workers. Age Discrimination in Employment Act Amendments of 1978, § 3(a), 92 Stat. 189, 29 U. S. C. § 631(b) (hereinafter 1978 Amendments).

---

[1] Federal employees are covered in a separate section of the Act and are treated differently from nonfederal employees in various ways not relevant to this case. See 29 U. S. C. § 633a (extending antidiscrimination provisions to federal employees, but providing such employees a different remedy for violations); § 631 (establishing 70 as a permissible retirement age for all but federal employees, for whom there is no permissible cap). Cf. *Vance* v. *Bradley*, 440 U. S. 93 (1979) (lower retirement age for federal employees covered by Foreign Service retirement system does not violate equal protection).

[2] See Senate Special Committee on Aging, Improving the Age Discrimination Law, 93d Cong., 1st Sess., 14, 17–18 (Comm. Print 1973); EEOC, Legislative History of the Age Discrimination in Employment Act 215, 231, 234–235 (1981) (hereinafter Legislative History).

The Act contains several minor exemptions not at issue here. See, *e. g.*, 29 U. S. C. §§ 630(f), 631(c)(1). It additionally empowers the Equal Employment Opportunity Commission (EEOC) to determine BFOQs for federal employees, 29 U. S. C. § 633a(b), and also to establish general exemptions from the ADEA if it finds them to be reasonable and "necessary and proper in the public interest." 29 U. S. C. § 628. In 1980, the EEOC examined the desirability of fixing a retirement age for local firefighters and concluded that such an exemption from the ADEA was not warranted. The Commission found that individual assessments of fitness would be feasible and that age alone would be a poor indicator of ability in this occupation. See App. 5–23.

The 1978 Amendments eliminated substantially all federal age limits on employment, but they left untouched several mandatory retirement provisions of the federal civil service statute applicable to specific federal occupations, including firefighters, air traffic controllers, and law enforcement officers, as well as mandatory retirement provisions applicable to the Foreign Service and the Central Intelligence Agency. Among the provisions that were left unaffected by the 1978 Amendments is 5 U. S. C. § 8335(b), which requires certain federal law enforcement officers and firefighters to retire at age 55 if they have sufficient years of service to qualify for a pension and their agency does not find that it is in the public interest to continue their employment.[3]  As a result, most federal firefighters must retire at age 55, despite the provisions of the ADEA.  At issue here is the effect of this age limit for federal firefighters on the ADEA's application to state and local firefighters.

A

Six firefighters brought this action in the District Court for the District of Maryland challenging the city of Baltimore's municipal code provisions that establish for firefighters and police personnel a mandatory retirement age lower than 70. They claimed that these provisions violate the ADEA.  The Equal Employment Opportunity Commission (EEOC) subsequently intervened to support the six plaintiffs.

---

[3] Title 5 U. S. C. § 8335(b) provides:

"A law enforcement officer or a firefighter who is otherwise eligible for immediate retirement under section 8336(c) of this title shall be separated from the service on the last day of the month in which he becomes 55 years of age or completes 20 years of service if then over that age.  The head of the agency, when in his judgment the public interest so requires, may exempt such an employee from automatic separation under this subsection until that employee becomes 60 years of age.  The employing office shall notify the employee in writing of the date of separation at least 60 days in advance thereof.  Action to separate the employee is not effective, without the consent of the employee, until the last day of the month in which the 60-day notice expires."

Until 1962, all Baltimore employees, including firefighters, were covered by the Employees Retirement System (ERS), which provided for mandatory retirement at age 70.  App. 4. In 1962, the city established the Fire and Police Employee Retirement System (FPERS), which generally requires that all firefighting personnel below the rank of lieutenant retire at age 55.  See FPERS, Baltimore City Code, Art. 22, § 34(a) 1–4 (1983); App. 3.  Lieutenants and other higher ranking officers may work until age 65.  *Ibid.*  When the FPERS was implemented in 1962, special provision was made for personnel hired before 1962, who were given the option of remaining in the ERS or transferring to the FPERS under a special grandfather provision.  Firefighters hired before 1962 who chose to remain in the ERS may continue to work until age 70 even today.  See 515 F. Supp. 1287, 1297, n. 10 (Md. 1981).  Firefighters hired before 1962 who are covered by the newer FPERS may work until age 60 or, in some limited circumstances, until age 65.  *Ibid.*  The plaintiffs here include five firefighters covered by this grandfather clause who are subject to retirement at age 60, and one firefighter hired after 1962, who is subject to retirement at age 55.

The city[4] asserted as an affirmative defense that age is a BFOQ for the position of firefighter and that the mandatory retirement provision therefore was permissible under the ADEA.  After a 6-day bench trial, at which each side presented expert and nonexpert testimony on the validity of the BFOQ defense, the District Court held that the city had failed to produce sufficient evidence to make out its BFOQ defense.[5]  The court considered both the particular condi-

---

[4] The defendants were the Mayor and City Council of Baltimore and the Chairman and members of the Board of Trustees of the Fire and Police Employees Retirement System of the city of Baltimore.  We refer to these defendants collectively as the "city."

[5] Plaintiffs did not argue that a retirement age of 65 would violate the ADEA but instead essentially sought the same retirement age applicable

tion of the plaintiff firefighters and the general operation of
the Baltimore Fire Department, noting that "historically Bal-
timore firemen have always worked past [age 60] and even up
to age seventy," 515 F. Supp., at 1297. It then applied the
two-pronged test developed by the Court of Appeals for the
Fifth Circuit in *Usery* v. *Tamiami Trail Tours, Inc.*, 531 F.
2d 224 (1976), and adopted by the Fourth Circuit.[6] The trial
court concluded that the city had shown neither that "there is
a factual basis for [it] to believe that all or substantially all
Baltimore City firefighters between the ages of sixty and
sixty-five, other than officers, would be unable to perform
their job safely and efficiently," 515 F. Supp., at 1296, nor
that "it is impossible or impractical to deal with firefighters
between sixty and sixty-five on an individualized basis."
*Ibid.* The court therefore struck down the city's mandatory
retirement plan for firefighters.

A divided panel of the Court of Appeals for the Fourth Cir-
cuit reversed. 731 F. 2d 209 (1984). The majority did not
take issue with the District Court's findings that the city had
failed to prove that age was a BFOQ for firefighters. In-
stead, the court held that the city was entitled to the BFOQ
defense as a matter of law. To reach that conclusion, the ap-
pellate court relied on language from this Court's decision in
*EEOC* v. *Wyoming*, 460 U. S. 226 (1983), in which we upheld
the constitutionality of Congress' extension of the ADEA to
state and local governments. In that decision we observed

to lieutenants. The case therefore presented only the question whether
mandatory retirement prior to age 65 violates the ADEA.

[6] The District Court required the city to show (1) that the BFOQ it in-
vokes " 'is reasonably necessary to the essence of its business' of operating
an efficient fire department within the City of Baltimore, and (2) that de-
fendants have 'reasonable cause, *i. e.*, a factual basis for believing that all
or substantially all persons within the class . . . would be unable to perform
safely and efficiently the duties of the job involved, or that it is impossible
or impractical to deal with persons over the age limit on an individualized
basis.' " 515 F. Supp., at 1295 (quoting *Arritt* v. *Grisell*, 567 F. 2d 1267,
1271 (CA4 1977)).

that the ADEA tests a State's discretion to impose a mandatory retirement age "against a reasonable federal standard." *Id.*, at 240. The Court of Appeals undertook a "search for a 'reasonable federal standard'" by which to test the asserted BFOQ; it found that standard in the federal civil service statute, 5 U. S. C. § 8335(b), which generally requires federal firefighters to retire at age 55. See n. 3, *supra.* The court held that, because Congress has selected age 55 as the retirement age for most federal firefighters, as a matter of law the same age constitutes a BFOQ for all state and local firefighters as well. Therefore, the court concluded, the city was not required to make any factual showing at trial as to its need for the mandatory retirement age.[7]

Because this case presents serious questions about the administration of the ADEA, we granted certiorari to review the decision of the Court of Appeals. 469 U. S. 1156 (1985). We now reverse.

B

*EEOC* v. *Wyoming* arose out of a lawsuit filed by a Wyoming state game warden who was required under state law to retire at age 55. He brought an action against the State and various of its officials claiming that its mandatory requirement violated the ADEA. The District Court held that the ADEA violated the Tenth Amendment insofar as it regulated Wyoming's employment relationship with its game wardens and other law enforcement officers and dismissed the suit. In rejecting that argument, we explained that the ADEA did not unduly intrude into the exercise of governmental func-

---

[7] Chief Judge Winter dissented. He rejected the panel's conclusion that the civil service provision necessarily constituted a congressional determination that age 55 is a BFOQ for federal firefighters but asserted that even if it were a BFOQ for federal firefighters, that fact would not excuse the city from proving facts necessary to establish a BFOQ under 29 U. S. C. § 623(f)(1). Concluding that the District Court's factual findings on the city's proof were not clearly erroneous, he would have affirmed the District Court.

tions because it did not require employers to retain unfit employees, but only at most to make more individualized determinations about fitness. Moreover, we noted that, in light of the BFOQ defense, States might in fact remain free from the obligation even to make more individualized showings:

> "Perhaps more important, appellees remain free under the ADEA to continue to do *precisely what they are doing now*, if they can demonstrate that age is a 'bona fide occupational qualification' for the job of game warden. . . . Thus, . . . even the State's discretion to achieve its goals *in the way it thinks best* is not being overridden entirely, but is merely being tested against a reasonable federal standard." 460 U. S., at 240 (emphasis in original).

We remanded to give Wyoming an opportunity to prove at trial that age 55 was in fact a BFOQ for Wyoming game wardens.

In this case, the Court of Appeals interpreted our use of the term "reasonable federal standard" in the quoted passage to mean that the question whether an age limit for nonfederal employees is permissible under the ADEA may be resolved simply by reference to a federal statute establishing a retirement age for a class of federal employees. It seized on the retirement provisions of the federal civil service statute, which require that federal firefighters retire at age 55. Then, without considering the intent underlying that provision, it held that, as a matter of law, age must therefore be a BFOQ for local firefighters.

The "reasonable federal standard" to which we referred in *EEOC* v. *Wyoming*, however, is the standard supplied by the ADEA itself—that is, whether the age limit is a BFOQ. By use of that phrase, we intended only to reaffirm that the BFOQ standard permits an employer to maintain a mandatory retirement age as long as the employer makes the requisite showing that age is a BFOQ. Nothing in the ADEA or

362

our decision in *Wyoming* warrants the conclusion that a federal rule, not found in the ADEA, and by its terms applicable only to federal employees, *necessarily* authorizes a state or local government employer to maintain a mandatory retirement age as a matter of law. To make the fact that the Federal Government has imposed a mandatory age limit on its own firefighters automatically dispositive of the question whether the same age limit is appropriate for state and local officers, without in any way examining the provision, would extend the federal rule far beyond its scope. It would apply to state and local employees a statute applicable by its terms only to federal officers. The mere fact that some federal firefighters are required to cease work at age 55 does not provide an absolute defense to an ADEA action challenging state and local age limits for firefighters.

The Court of Appeals in this case failed to focus on the city's factual showing and instead centered its attention on the federal retirement provisions of the United States Code. We would be remiss, in light of Congress' indisputable intent to permit deviations from the mandate of the ADEA only in light of a particularized, factual showing, see H. R. Rep. No. 805, 90th Cong., 1st Sess., 7 (1967); Legislative History 80; S. Rep. No. 723, 90th Cong., 1st Sess., 7 (1967); Legislative History 111,[8] to permit nonfederal employers to circumvent this plan by mere citation to an unrelated statutory provision that is not even mentioned in the ADEA.

## II

The city, supported by several *amici*, argues for affirmance nonetheless. It asserts first that the federal civil

---

[8] To this end, the lower courts have fashioned tests for finding a BFOQ that focus, first, on the individual employer's need for an age limit, and, second, on the factual basis for his belief that all workers above a certain age are not qualified and on his proof that individual testing is highly impractical. We have today elaborated on the precise standard to be applied. *Western Air Lines, Inc.* v. *Criswell, post,* at 412–417.

service statute is not just a federal retirement provision unrelated to the ADEA but *in fact* establishes age as a BFOQ for federal firefighters based on factors that properly go into that determination under the ADEA, see *Western Air Lines, Inc.* v. *Criswell, post,* p. 400. Second, the city asserts, a congressional finding that age is a BFOQ for a certain occupation is dispositive of that determination with respect to nonfederal employees in that occupation. We consider each of these contentions in turn.

## A

We must first resolve whether the age-55 retirement for federal firefighters reflects a congressional determination that age 55 is a BFOQ within the meaning of the ADEA, as the city urges, or whether Congress established the mandatory retirement age based on an analysis different from that mandated by the BFOQ standard. On this question, the statute is silent. Section 8335(b), the federal civil service provision, does not by its terms or history evince an intent to cover nonfederal employees, or to limit the scope of the ADEA. Nor does the ADEA, which was passed later, cross-reference the civil service statute or in any way express a congressional desire to exempt any firefighters from the full effect of the Act's reach.[9] In other words, in the language of neither statute has Congress indicated that the civil service provision reflects anything more than a congressional decision that federal firefighters must retire, as a general matter, at the age of 55.

The history of the civil service provision, however, makes clear that the decision to retire certain federal employees at an early age was not based on BFOQs for the covered em-

---

[9] Recently, legislation to exempt state and local firefighters and law enforcement officers from the ADEA has been introduced in both the Senate and the House of Representatives. See S. 698, 99th Cong., 1st Sess. (introduced March 20, 1985); H. R. 1435, 99th Cong., 1st Sess. (introduced March 6, 1985).

ployment. This history demonstrates instead that Congress has acted to deal with the idiosyncratic problems of federal employees in the federal civil service. The Federal Government first introduced early retirement for certain employees in 1947 with passage of legislation *permitting* investigatory personnel of the Federal Bureau of Investigation to retire at age 50 at an enhanced annuity. Act of July 11, 1947, ch. 219, 61 Stat. 307. Congress in 1948 extended this program to anyone whose duties for at least 20 years were primarily the investigation, apprehension, or detention of persons suspected or convicted of federal criminal law violations, see Act of July 2, 1948, ch. 807, 62 Stat. 1221. In 1972, this voluntary retirement provision was further extended to federal firefighters. See Act of Aug. 14, 1972, Pub. L. 92–382, 86 Stat. 539.

The provision as initially passed was intended only to give certain employees the option to retire early. It was designed in part as an "added stimulus to morale in the Federal Bureau of Investigation . . . [to] stabilize the service of the Federal Bureau of Investigation into a career service. . . . [and to] act as an incentive to investigative personnel of the [FBI] to remain in the Federal service until a reasonable retirement age is reached." S. Rep. No. 76, 80th Cong., 1st Sess., 1–2 (1947). In addition, as then Attorney General Tom C. Clark explained, the Department of Justice sought to maintain the FBI "as a 'young man's service.'" He added that "men in their 60's and 70's, forced to remain in the service, faced with the rigors of arduous service demanded of special agents and others, [should not be] forced to carry on for lack of an adequate retirement plan to fit the needs of the FBI service." *Id.*, at 2.

In 1974, Congress amended the statute to provide that these same federal employees *must* retire at age 55 if they had completed 20 years of service, and it provided an enhanced annuity. As with the voluntary retirement scheme, one goal of the 1974 amendment was to maintain "relatively

young, vigorous, and effective law enforcement and fire-fighting workforces." H. R. Rep. No. 93–463, p. 2 (1973). The amendment also was designed to replace the existing provision, which was having an adverse impact on the quality of older federal employees, because "most of those who retire in their early fifties are the more alert and aggressive employees who have found desirable jobs outside of Government," *id.*, at 3; in contrast, the newer mandatory scheme would enable management to "retire, without stigma, one who suffers a loss of proficiency." Retirement for Certain Hazardous Duty Personnel: Hearing on H. R. 6078 and H. R. 9281 before the Subcommittee on Compensation and Employment Benefits of the Senate Committee on Post Office and Civil Service, 93d Cong., 2d Sess., 134 (1974) (testimony of Rep. Brasco, sponsor of House bill).

Congress undoubtedly sought in significant part to maintain a youthful work force and took steps through the civil service retirement provisions to make early retirement both attractive and financially rewarding. However, neither the language of the 1974 amendment nor its legislative history offers any indication why Congress wanted to maintain the image of a "young man's service," or why Congress thought that 55 was the proper cutoff age, or whether Congress believed that older employees in fact could not meet the demands of these occupations. Indeed, Congressmen who opposed the bill voiced their concern for the singling out of one group of employees for preferential treatment through enhanced annuities and early retirement, and did not even acknowledge that the exigencies of the job might have anything to do with Congress' willingness to accord special treatment to a group of employees. H. R. Rep. No. 93–463, *supra,* at 20. Moreover, the allowance that firefighters who had not yet served for 20 years could remain in their jobs, see *id.*, at 6, along with other exceptions to the general rule of retirement, casts serious doubt on any argument that Congress in fact believed that either the employee or

the public would be jeopardized by the employment of older firefighters.

The absence of any indication that Congress established the age limit based on the demands of the occupation raises the possibility that the federal rule is merely "an example of the sort of age stereotyping without factual basis that was one of the primary targets of the reforms of the ADEA," Brief for Petitioner in No. 84–710, p. 38, and surely belies any contention that the age limit is based on actual occupational qualifications. Without knowing whether Congress passed the statute based on factual support, legislative balancing of competing policy concerns, or stereotypical assumptions, we simply have no way to decipher whether it is consistent with the policies underlying the ADEA.[10]

Congress' treatment of the civil service provision when it extended the ADEA to federal employees in 1978 conclusively demonstrates that the retirement statute does not

---

[10] Congress, of course, may exempt federal employees from application of the ADEA and otherwise treat federal employees, whose employment relations it may directly supervise, differently from those of other employers, see, e. g., 26 U. S. C. § 3306(c)(6) (unemployment compensation not applicable to federal employees); 29 U. S. C. § 152(2) (exempting federal employees from labor relations legislation); indeed it has done so elsewhere in the ADEA. While Congress at first exempted federal employees from the reach of the Act, it now applies even more protective rules to older federal employees than it imposes on other employers. See 29 U. S. C. §§ 631(a), 631(b) (federal employees generally cannot be forced to retire at any age, while similarly situated nonfederal employees may be forced to retire at age 70). It might be that congressional findings leading to the conclusion that age is a BFOQ for a certain federal occupation would be of relevance to a judicial inquiry into age as a BFOQ for other employers, even absent express congressional direction on this point. See *infra.* But this relevance derives from a recognition that Congress might already have engaged in the same inquiry that a district court must make, and a district court might find congressionally gathered evidence useful and congressional factfinding persuasive. Contrary to the suggestion of the Court of Appeals, 731 F. 2d 209, 212–213 (CA4 1984), Congress is not always required to treat federal and nonfederal employees in the same way.

represent a congressional determination that age is an occupational qualification for federal firefighters. The decision to retain mandatory retirement provisions for certain federal employees resulted not from a finding that the provisions met the standards of the ADEA, but rather from an agreement to provide to the congressional Committees with jurisdiction over the retirement programs at issue the opportunity to review those provisions. Instead of delaying passage of the ADEA while those Committees studied the mandatory retirement provisions in light of the proposed ADEA, Congress decided to preserve the status quo with respect to the retirement program, pending further study. This express purpose definitively rules out any conclusion that Congress approved the retirement programs in light of the ADEA.

As first reported out of Committee in 1977, the 1978 Amendments to the ADEA removed all age limitations on federal employment, *"notwithstanding any other provisions of Federal law relating to mandatory retirement requirements. . . ."* H. R. 5383, 95th Cong., 1st Sess., 5 (1977); Legislative History 396. Representative Nix, Chairman of the House Post Office and Civil Service Committee, thereafter expressed concern that the "broad general language" of the proposed bill would repeal various statutory provisions within the primary jurisdiction of his Committee. See 123 Cong. Rec. 29003–29004 (1977) (letter to Rep. Perkins, Chairman of the House Committeee on Education and Labor); Legislative History 400–401. He suggested that his colleagues' desire to expedite consideration of the bill could be accommodated through an amendment eliminating provisions of concern to his Committee. *Ibid.* This proposal met with approval, see *ibid.*, and accordingly, Representative Spellman offered an amendment, on behalf of the House Post Office and Civil Service Committee, to retain the mandatory retirement provisions applicable to certain specific federal occupations, including law enforcement officials and firefighters. See 123 Cong. Rec. 29002 (1977) (statement of Rep. Hawkins); Legis-

lative History 399.    In so doing, Representative Spellman stated:

> "I hasten to point out that this amendment does not indicate opposition perse [*sic*] to elimination of mandatory retirement for air traffic controllers, firefighters, and other specific occupations.
>
> "However, since most of these mandatory retirement provisions are part of the liberalized retirement programs, our committee believes that such provisions should not be repealed until the individual retirement programs have been reexamined."    123 Cong. Rec. 30556 (1977); Legislative History 415.

Similarly, Representative Pepper, a sponsor of the 1978 Amendments, made clear:

> "For the record, Mr. Chairman, I should state what might appear to be obvious: That we in the House, in debating and passing this amendment, are making no judgment whatever on the desirability of retaining the ages now established by the various statutes affected for forced retirement.    That judgment, I am sure, will be rendered when the committees involved bring subsequent legislation to the floor."    *Ibid.*

And again, Representative Hawkins, Chairman of the Subcommittee on Employment Opportunities of the House Committee on Education and Labor, stated that "[t]he sole purpose of this agreement is to afford the committees the opportunity to review these statutes."    *Ibid.*    The mandatory retirement provisions were, accordingly, retained when the 1978 Amendments were enacted.    See Pub. L. 95–256, § 5(c), 92 Stat. 191; see also H. R. Conf. Rep. No. 95–950, pp. 10–11 (1978); Legislative History 521–522.[11]

---

[11] Thereafter, Representative Spellman's Subcommittee held hearings on the retirement provisions of 5 U. S. C. § 8335(b) and heard testimony on the mandatory provision.    Special Retirement Policies for Law Enforce-

In sum, almost four decades of legislative history establish that Congress at no time has indicated that the federal retirement age for federal firefighters is based on a determination that age 55 is a BFOQ within the meaning of the ADEA. Congress adopted what might well have been an arbitrarily designated retirement age in an era not concerned with the pervasive discrimination against the elderly that eventually gave rise to the ADEA. Thereafter, although Congress retained mandatory limitations in 1978, while questioning whether they continued to make good policy sense, it did so for the sake of expediency alone. On considering the language and history of the civil service provision, we find it quite possible that factors other than conclusive determinations of occupational qualifications might originally have

---

ment Officers and Firefighters: Hearings before the Subcommittee on Compensation and Employee Benefits of the House Committee on Post Office and Civil Service, 95th Cong., 1st Sess. (1977); Hearings on H. R. 7945 before the Subcommittee on Compensation and Employee Benefits of the House Committee on Post Office and Civil Service, 95th Cong., 1st Sess. (1977). The Subcommittee also considered a report of the General Accounting Office, which found that "[r]etirement policies that disregard difference in physical abilities and productive capacity are costly and wasteful." Report to the House Committee on Post Office and Civil Service by the Comptroller General of the United States: Special Retirement Policy for Federal Law Enforcement and Firefighter Personnel Needs Reevaluation 10 (1977). The Subcommittee took no action to change the mandatory rules.

More recently, Congress has again been confronted with a Report suggesting that mandatory age limits for law enforcement personnel are unnecessary and wasteful. The Report, published by the House Select Committee on Aging, states that "it is impossible to justify mandatory retirement or maximum hiring age policies based on arguments of public safety or job-related performance." Chairman, House Select Committee on Aging, The Myths and Realities of Age Limits for Law Enforcement and Firefighting Personnel, 98th Cong., 2d Sess., IV (Comm. Print 1984). Legislation also has been introduced in the House to eliminate mandatory retirement for all federal employees not currently covered by the ADEA, including firefighters. H. R. 1710, 99th Cong., 1st Sess. (introduced March 25, 1985).

led to passage of this federal rule, and that the reason for its retention after 1978 further undercuts any argument that Congress has determined that age is a BFOQ for federal firefighters.

In the absence of an indication that Congress in fact grounded the age limit on occupational qualifications, we will not presume that it did so intend. The myriad political purposes for which Congress might properly make decisions affecting federal employees, and that body's uncontested authority to exempt federal employees from the requirements of federal regulatory statutes, simply do not permit the conclusion that Congress passed or retained this retirement provision because it reflects BFOQs.[12] We therefore conclude that this civil service provision does not articulate a BFOQ for firefighters, that its presence in the United States Code is not relevant to the question of a BFOQ for firefighters, and that it would be error for a court, faced with a challenge under the ADEA to an age limit for firefighters, to give any weight, much less conclusive weight, to the federal retirement provision.

B

Were there evidence that Congress in fact determined that a class of federal employees must retire early based on the same considerations that support a finding of a BFOQ under the Act, the situation might differ. Of course, if Congress expressly extended the BFOQ to nonfederal oc-

---

[12] Nor do we have any reason to believe that, when the city imposed its mandatory retirement scheme in 1962, it was relying on a congressional determination of any kind. The history of the civil service provision up to that time reveals no congressional finding of an occupational qualification, and in fact in 1962 the congressional scheme remained completely voluntary. It was not until 1974 that Congress even rendered early retirement mandatory. Indeed, the city pointed out to the Court of Appeals that it instituted its mandatory retirement plan "more than a decade before the federal government did likewise." Answer of Appellant City to Petition for Rehearing with Suggestion for Rehearing en Banc in No. 81–1965 (CA4), pp. 9–10.

cupations, that determination would be dispositive. But if it did not, the federal exemption nevertheless might be relevant to an appropriate employer when deciding whether to impose a mandatory retirement age, and to a district court engaged in reviewing an employer's BFOQ defense. The evidence Congress has considered, and the conclusions it has drawn therefrom, might be admissible as evidence in judicial proceedings to determine the existence of a BFOQ for nonfederal employees. The extent to which these factors are probative would, of course, vary depending at least on the congruity between the federal and nonfederal occupations at issue. Indeed, the need to consider the actual tasks of the nonfederal employees and the circumstances of employment, in order to determine the extent to which congressional conclusions about federal employees in fact are relevant, would preclude the kind of wholesale reliance on the federal rule that the city suggests. See *supra*, at 362–363. Because in this case the evidence supports no such finding of congressional intent to establish a BFOQ, however, we decline to speculate on the manner in which a different federal rule might affect nonfederal employment.

### III

We accordingly reverse the Court of Appeals' holding that the federal retirement provision at issue in this case provides an absolute defense in an ADEA action. We remand to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*