KAVANAUGH, Circuit Judge,
dissenting:
John Miller worked as a safety inspector at the U.S. Embassy in Paris. His employment contract with the State Department required him to retire at age 65. After Miller turned 65 and the State Department forced him to retire, he sued and claimed that his mandatory retirement violated the Age Discrimination in Employment Act.
The problem for Miller is that federal law allows the State Department to maintain a mandatory retirement policy for personnel employed abroad. The relevant statute expressly authorizes the State Department to contract with American workers in foreign locations “without regard” to “statutory provisions” relating to the “performance of contracts and performance of work in the United States” — in other words, to contract with workers in foreign locations notwithstanding statutory provisions such as the ADEA that relate to the performance of contracts and performance of work in the United States. The State Department thus did not violate federal law when it required Miller to retire at age 65. In my view, this is not a close case, at least as a matter of law. I therefore would affirm Judge Huvelle’s decision rejecting Miller’s claim.
To be sure, Congress could (and perhaps should) change the law and bar the State Department from imposing mandatory retirement in these kinds of circumstances. Moreover, even under existing law, the President, the Secretary of State, and appropriate subordinate officers in the State Department could (and perhaps should) alter the current policy and no longer mandate retirement at age 65 for workers such as Miller. But our job is to apply and enforce the law as it is written. In my judgment, the majority opinion has not correctly performed that task. I respectfully dissent.
I
In 1996, the State Department hired John Miller, a U.S. citizen, to work as a supply supervisor at the U.S. Embassy in Paris, France. In 2003, Miller became a safety inspector. The State Department’s 2003 contract with Miller incorporated all ■ “provisions of the local compensation plan” governing employment of staff at the Embassy. J.A. 23. That local compensation plan included a “retirement” clause that stated: “Age 65 is the mandatory age limit for all employees.... ” J.A. 26. Therefore, Miller’s contract required retirement at age 65. When Miller turned 65, the State Department terminated his employment.
Miller claims that his forced retirement at age 65 violated the Age Discrimination in Employment Act.
In 1967, Congress enacted the ADEA to ban age discrimination by certain private employers (the law now applies to employers with 20 or more employees). See Pub.L. No. 90-202, 81 Stat. 602. In 1974, Congress extended the ADEA to federal agencies. See Pub.L. No. 93-259, § 28(b)(2), 88 Stat. 55, 74. The ADEA provision protecting federal agency employees states in relevant part: “All personnel actions affecting employees ... who are at least 40 years of age ... in executive agencies ... shall be made free from any discrimination based on age.” 29 U.S.C. § 633a(a). Applying that statute, courts have concluded that federal agencies generally may not require retirement based on age. See, e.g., Johnson v. Mayor and City Council of Baltimore, 472 U.S. *1354 353, 355-57 & n. 1, 366 n. 10, 105 S.Ct. 2717, 86 L.Ed.2d 286 (1985); Forman v. Small, 271 F.3d 285, 297 (D.C.Cir.2001).[1]
However, there are numerous exceptions to the ADEA. See, e.g., 29 U.S.C. § 623(f) (exceptions “where age is a bona fide occupational qualification” and where compliance with the ADEA would cause an employer “to violate the laws of the country in which [a] workplace is located”); 29 U.S.C. § 623(j) (exception for state firefighters and law enforcement officers); 29 U.S.C. §§ 628, 633a(b) (exceptions may be created by the Equal Employment Opportunity Commission); 29 U.S.C. § 630(b) (exception for small employers); 29 U.S.C.' § 631(c) (exception for executives and high policymakers); 29 U.S.C. § 633a(a) (exception for judicial branch employees in the noncompetitive service); see also, e.g., 5 U.S.C. § 8335 (mandatory retirement of air traffic controllers, law enforcement officers, firefighters, nuclear materials couriers, customs and border protection officers, Capitol Police, and Supreme Court Police); 22 U.S.C. § 4052 (mandatory retirement of foreign service officers); Johnson, 472 U.S. at 357, 105 S.Ct. 2717; Strawberry v. Albright, 111 F.3d 943, 947 (D.C.Cir.1997).
As those many examples show, statutory exceptions to the ADEA — including mandatory retirement provisions for certain federal employees — are quite common. This case presents another such exception.
As amended in 1994, the State Department Basic Authorities Act authorizes the State Department to employ U.S. citizens abroad without regard to the ADEA. See 22 U.S.C. § 2669(c).[2] In 1956, Congress initially passed the State Department Basic Authorities Act. See Pub.L. No. 84-885, 70 Stat. 890; see also Pub.L. No. 98-533, § 303, 98 Stat. 2706, 2710 (1984). Before 1994, Section 2(c) of the Act authorized the State Department to employ individuals by contract for services abroad. In 1994, Congress amended Section 2(c) to add that
such contracts are authorized to be negotiated, the terms of the contracts to be prescribed, and the work to be performed, where necessary, without regard to such statutory provisions as relate to the negotiation, making, and performance of contracts and performance of work in the United States.
Pub.L. No. 103-236, §§ 137, 180(b), 108 Stat. 382, 397, 416 (emphasis added); see also 22 U.S.C. § 2669(c).[3] The text of Section 2(c) as amended establishes that *1355 the State Department may negotiate employment contracts for services abroad without regard to U.S. employment laws.
In this case, the State Department’s contract with Miller plainly fell within Section 2(c). First, the State Department employed Miller “by contract, for services abroad.” And second, the ADEA is a “statutory provision! ]” that relates to the “performance of contracts and performance of work in the United States.” [4] Indeed, there is no dispute in this case that the ADEA is a statutory provision related to the “performance of contracts and performance of work in the United States.”[5] The majority opinion itself acknowledges that the ADEA is “part of the backdrop of employer-employee relations in the United States” and seems to accept that the ADEA is therefore a law relating to the performance of contracts and performance of work. Maj. Op. at 1345-46.
In short, the text of Section 2(c) of the State Department Basic Authorities Act *1356 authorized the State Department to require Miller to retire at age 65, notwithstanding the.ADEA.
To the extent it’s relevant, the legislative history further demonstrates that Section 2(c) allows the State Department to employ U.S. citizens abroad without regard to the ADEA. In the years leading up to the 1994 amendment to Section 2(c), embassies and other State Department outposts abroad could hire foreign nationals in accordance with local wage rates and other compensation practices, but they generally could not do the same for American citizens working abroad. See 140 Cong. Rec. 564-67 (1994) (statement of Sen. Rockefeller). And before the 1994 amendment, the State Department could require foreign workers to retire at age 65, but it could not require American workers to retire at age 65.
The legislative history of the 1994 amendment reveals that, because of the different rules for foreign and American workers that gave the State Department greater flexibility to hire and fire foreign workers, the State Department was hiring foreigners instead of Americans. Unhappy with that turn of events, Congress decided to exempt the State Department from certain employment laws when the Department employed U.S. citizens at foreign locations. The Conference Report described Congress’s intent to give the State Department “greater flexibility” in hiring U.S. citizens abroad. H.R.Rep. No. 103-482, at 171, 182 (1994), 1994 U.S.C.C.A.N. 398, 422 (Conf.Rep.). The Conference Report explained that Congress wanted to “ensure that everything possible is being done to enable American citizens abroad to compete on a most favored competitor basis” and encouraged the State Department to review “U.S. laws and regulations that may impede the ability of American citizens abroad to compete in world markets with citizens of other nations on a level playing field.” Id. at 182.[6] In other words, so as not to disadvantage American workers, Congress exempted the State Department from various U.S. employment statutes (from which foreign workers already were exempt) and thereby enabled Americans to better compete with foreigners when seeking positions at embassies abroad.
One might well ask: Why didn’t Congress in 1994 level the playing field in a different way — by extending U.S. employment laws to foreign workers at State *1357 Department posts abroad rather than by declining to apply U.S. employment laws to American workers at State Department posts abroad? Recall that as of 1994, the ADEA had long exempted aliens employed abroad from its protections. That exemption for aliens employed abroad apparently stemmed from a desire to avoid conflict with foreign nations. Foreign nations might take offense if the United States as an employer afforded citizens of foreign nations protections different from those usually provided in that foreign nation. Moreover, the Foreign Service Act had long authorized the State Department to pay foreign workers overseas according to “local compensation plans.” 22 U.S.C. § 3968. Pursuant to those plans, foreign workers received wages and were subject to compensation practices that were typical of the host country. That was in order to “eliminate complaints from host governments and employees over compensation issues” and to improve morale. S.Rep. No. 96-913, at 41 (1980), 1980 U.S.C.C.A.N. 4419, 4459. It also avoided “undesirable litigation which woúld result from failure to comply with certain labor laws and practices in foreign countries.” Id.; see also 3 Foreign Affairs Handbook 2, at H-212 D (2003) (“Posts must adhere to local labor, employment and social security laws to the maximum extent practicable” in matters that affect foreign national employees).
Apparently for those reasons, when amending the Basic Authorities Act in 1994, Congress did not extend U.S. employment laws to foreign workers. Rather, to level the playing field and give American workers a fair chance to compete for those jobs at State Department posts abroad, Congress instead exempted American workers abroad from those U.S. employment laws.
In short, the text of Section 2(c) of the State Department Basic Authorities Act, as amended in 1994, authorized the State Department to mandate retirement at age 65 for workers such as Miller. I therefore would affirm the District Court’s dismissal of Miller’s suit. This is not a close call.
II
The majority opinion comes to a contrary conclusion by downplaying the relevant statutory text, stacking the deck with inapposite interpretive presumptions, and raising the specter of rampant race, sex, and religious discrimination by the U.S. State Department against U.S. citizens employed abroad. In my view, all of that is a smokescreen — on close inspection, none of the majority opinion’s arguments holds up.
First, the majority opinion repeatedly points out that the text of Section 2(c), the general statutory authorization for the State Department to hire and fire abroad without regard to other U.S. employment laws, does not specifically refer to the ADEA or age-based employment decisions. But Section 2(c) plainly gives the Secretary discretion to negotiate employment contracts for workers abroad without regard to statutes relating to the performance of contracts and performance of work in the United States. The ADEA is quite obviously such a statute. End of case.
'Contrary to the majority opinion’s suggestion, there is no “plain statement” requirement that Congress must meet to exempt federal agencies from the ADEA. The Supreme Court has repeatedly stated that courts should generally adhere to a statute’s text. That cardinal principle applies to broadly worded statutes; Congress does not have to specifically address subsidiary issues encompassed by broad statutory wording. Under the majority opinion’s theory, by contrast, a statute ex *1358 empting “animals” from a statutory ban on swimming in a river wouldn’t apply to dogs because the statute didn’t specifically refer to dogs. That’s not how courts interpret laws. See, e.g., DePierre v. United States, - U.S. -, 131 S.Ct. 2225, 2235, 180 L.Ed.2d 114 (2011) (Congress chose “a statutory term that would encompass all forms” of chemically basic cocaine; Court refused to read that term as only encompassing one form); Ali v. Federal Bureau of Prisons, 552 U.S. 214, 226, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008) (“‘any other law enforcement officer’ sweeps as broadly as its language suggests”); Norfolk & Western Railway Co. v. American Train Dispatchers’ Ass’n, 499 U.S. 117, 129-34, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) (phrase “all other law” means all other laws); Acree v. Republic of Iraq, 370 F.3d 41, 62 (D.C.Cir.2004) (Roberts, J., concurring in part and concurring in the judgment) (“[P]laintiffs err in their assumption that the government must somehow prove that Congress intended the statute’s broad terms to be construed broadly. The burden is precisely the opposite: the party seeking to narrow the application of the statute must demonstrate that Congress intended something less than what the law on its face says.”) (citations omitted); Consumer Electronics Ass’n v. FCC, 347 F.3d 291, 298 (D.C.Cir.2003) (Roberts, J.) (“the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application”).
Second, the majority opinion suggests that Congress could not possibly have intended to permit mandatory retirement policies for U.S. citizens working abroad for the State Department. See, e.g., Maj. Op. at 1337-38 (State Department’s argument faces “an uphill climb” given “the importance Congress ascribed to the ADEA”); id. at 1338 (“We simply do not believe [Congress] would have authorized the State Department to ignore statutory proscriptions against discrimination ... through the use of ambiguous language.”); id. at 1346 (“it is hard for us to imagine that Congress would have hidden such a dramatic exemption from its landmark antidiscrimination laws in the anodyne language of § 2669(e)’s third clause”); id. at 1351 (“it would be surprising for Congress to assume such callousness on the part of State Department officials”).
Although the majority opinion does not explicitly use the term, the majority opinion is necessarily applying a form of the absurdity canon and saying that it would be absurd to read the broad statutory language to allow mandatory retirement policies for U.S. citizens working abroad for the State Department. The absurdity canon allows courts to disregard statutory text when adhering to the text “would result in a disposition that no reasonable person could approve.” Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 234 (2012). But the canon “can be a slippery slope. It can lead to judicial revision of public and private texts to make them (in the judges’ view) more reasonable.” Id. at 237. The hurdle for invoking the canon is thus “a very high one.” Id. It applies only when “the absurdity and injustice of applying the provision to the case would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application.” Id. (quoting 1 Joseph Story, Commentaries on the Constitution of the United States § 427 (1833)).
In this case, the majority opinion has not come close to showing that adhering to the plain language of the statute would be absurd. After all, mandatory retirement provisions, although generally forbidden by the ADEA and questionable as a policy matter in some circumstances, are quite common in both federal and state govern *1359 ment. For example, on the federal side, air traffic controllers, law enforcement officers, firefighters, and customs and border protection officers are subject to mandatory retirement. See 5 U.S.C. § 8385; see also 10 U.S.C. §§ 1251-1263 (mandatory retirement of military officers); 22 U.S.C. § 4052 (mandatory retirement of foreign service officers). At the state level, many law enforcement officers, firefighters, and judges, among others, face mandatory retirement. See, e.g., 29 U.S.C. § 623(j) (permitting states and localities to mandate retirement of state firefighters and law enforcement officers); Gregory v. Ashcroft, 501 U.S. 452, 455, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (mandatory retirement of Missouri judges). In light of these many mandatory retirement statutes, it cannot be deemed absurd to think that Congress would also permit an exception to the ADEA for U.S. citizens employed at State Department posts abroad.
Viewing the matter more broadly, the majority opinion’s intimation that it would be absurd to read the statute as written is necessarily premised on an assumption that the antidiscrimination statutes currently extend to every nook and cranny of American workforces — and that an exception here therefore would be especially extraordinary. That assumption, too, is wrong. Congress has devised a wide variety of limits and exceptions to the anti-discrimination statutes. For example, the ADEA and Title VII do not apply to small employers — generally those with fewer than 15 or 20 employees. See 29 U.S.C. § 630(b); 42 U.S.C. § 2000e(b). A significant number of American workers are employed at such small businesses — something like 20 million American workers according to the latest statistics. See Bureau of Labor Statistics, U.S. Dep’t of Labor, Distribution of Private Sector Employment by Firm Size Class. Courts likewise have determined that the ADEA and Title VII do not apply to uniformed personnel in the armed services. See, e.g., Hedin v. Thompson, 355 F.3d 746, 747-48 & n. 2 (4th Cir.2004).
Put simply, Congress has seen fit to allow numerous exceptions to the ADEA. Those exceptions flatly refute the majority opinion’s intimation that it would be exceptional to apply the text as written here.
In implicitly invoking a form of the absurdity canon, the majority opinion relatedly suggests that allowing the State Department to. terminate workers abroad at age 65 would lead to unbridled State Department discrimination on the basis of not only age, but also race, sex, and religion— and that Congress could not have intended such a result. But that is a red herring because the majority opinion’s premise is wrong. The inapplicability of the ADEA and other anti-discrimination legislation to State Department workers abroad does not license the State Department to discriminate against American workers abroad on the basis of race, sex, or religion. The State Department must act within the limits of the Constitution. The Due Process Clause of the Fifth Amendment bars the Federal Government from discriminating on the basis of race in employment. See Adarand Constructors, Inc. v. Mineta, 534 U.S. 103, 105, 122 S.Ct. 511, 151 L.Ed.2d 489 (2001). The Fifth Amendment likewise forbids invidious sex discrimination in federal government employment. See Tuan Anh Nguyen v. INS, 533 U.S. 53, 60, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001). Meanwhile, both the First and Fifth Amendments — as well as Article VI of the Constitution — bar the federal government from discriminating on the basis of religion in employment. Contrary to the majority opinion’s stated fears, a ruling in favor of the State Department here would not license the Depart *1360 ment to engage in unbridled race, sex, and religious discrimination against its American employees abroad.[7]
Based on the majority opinion’s two main assertions — that in Section 2(c) Congress did not expressly refer to the ADEA and that it would be absurd, in the majority opinion’s view, to read Section 2(c) to allow mandatory retirement policies — the majority opinion says it’s better to read Section 2(c) as referring only to statutes that establish government-wide requirements for federal contracting and procurement. But where in the statutory text is that limitation? If Congress had wanted to limit Section 2(c) in that manner, it presumably would have said so. It did not. The majority opinion is simply making up a statutory boundary that Congress did not set forth in the enacted text.
In my view, we should not try to snatch ambiguity from clarity. We should just read Section 2(c) as it’s written. The statute is not remotely ambiguous or difficult to apply in this case. The statute authorizes the Secretary to negotiate employment contracts for American workers abroad without regard to statutory provisions relating to the performance of contracts and performance of work in the United States. The ADEA is a statute relating to the performance of contracts and performance of work in the United States — and the majority opinion never seriously denies that point. That basic analysis resolves the case. Although I might disagree with the lines Congress has drawn in this statute, it is our job to respect those lines, not to re-draw them as we might prefer.[8]
* * *
*1361 To sum up, the text of the statute makes this a straightforward case, as a matter of law. That statutory text authorized the State Department to include a mandatory retirement provision in its contract with Miller. Therefore, I would affirm the judgment of the District Court. I respectfully dissent,

. In 1964, Congress enacted a similar statute, Title VII of the Civil Rights Act, to protect against employment discrimination by private employers on the basis of race, color, religion, sex, or national origin. See Pub.L. No. 88-352, §§ 701-716, 78 Stat. 241, 253-66. In 1972, Congress extended Title VII to federal agencies. See Pub.L. No. 92-261, § 11, 86 Stat. 103, 111.

. Since its initial enactment in 1974, the statute extending the ADEA to federal employees has exempted aliens employed abroad from the ADEA. See 29 U.S.C. § 633a(a); see also Pub.L. No. 93-259, § 28(b)(2), 88 Stat. 55, 74.

. The entire text of Section 2(c) reads: “The Secretary of State may use funds appropriated or otherwise available to the Secretary to ... employ individuals or organizations, by contract, for services abroad, and individuals employed by contract to perform such services shall not by virtue of such employment be considered to be employees of the United States Government for purposes of any law administered by the Office of Personnel Management (except that the Secretary may determine the applicability to such individuals of subsection (f) of this section and of any other law administered by the Secretary concerning the employment of such individuals abroad); and such contracts are authorized to be negotiated, the terms of the contracts to be prescribed, and the work to be performed, where necessary, without regard to such statutory provisions as relate to the negotiation, making, and performance of contracts and performance of work in the United States 22 U.S.C. § 2669(c).

. The ADEA is also a "statutory provision!]” that relates to the "negotiation” and “making” of contracts and is therefore covered by Section 2(c) for that reason as well, meaning that the State Department's mandatory retirement policy is exempt from the ADEA for that additional reason. For ease of reference, the analysis will refer to "performance of contracts and performance of work.”

. Nor could there be. The ADEA repeatedly speaks in terms of performance of work. See 29 U.S.C. § 621(a)(2) (finding by Congress that “the setting of arbitrary age limits regardless of potential for job performance ” had become a common practice) (emphasis added); 29 U.S.C. § 622 note (Secretary of Labor and EEOC must conduct study “to determine whether physical and mental fitness tests are valid measurements of the ability and competency of police officers and firefighters to perform the requirements of their jobs " and EEOC must propose guidelines "for the administration and use of physical and mental fitness tests to measure the ability and competency of police officers and firefighters to perform the requirements of their jobs ”) (emphases added); 29 U.S.C. § 623 note (2000) (Secretary of Health and Human Services must conduct study and issue guidelines "for the administration and use of physical and mental fitness tests to measure the ability and competency of law enforcement officers and firefighters to perform the requirements of the jobs of the officers and firefighters”) (emphasis added); 29 U.S.C. § 633a(b) ("Reasonable exemptions to the provisions of this section may be established by the Commission but only when the Commission has established a maximum age requirement on the basis of a determination that age is a bona fide occupational qualification necessary to the performance of the duties of the position.") (emphasis added).
Case law frequently refers to the ADEA as a statutory provision relating to the performance of work. See, e.g., Hazen Paper Co. v. Biggins, 507 U.S. 604, 610-11, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) ("Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes.... |T]he available empirical evidence demonstrated that arbitrary age lines were in fact generally unfounded and that, as an overall matter, the performance of older workers was at least as good as that of younger workers.”) (emphasis added) (internal quotation marks omitted); Wilkerson v. Shinseki, 606 F.3d 1256, 1266 (10th Cir.2010) (age discrimination claim under ADEA requires inquiry into whether plaintiff was "(1) within the protected class of individuals 40 or older!;] (2) performed satisfactory work; (3) terminated from employment; and (4) replaced by a younger person”) (emphasis added); Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir.2003) (hostile work environment claim under ADEA requires inquiry into "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance ”) (emphasis added) (citation omitted).
And in analyzing a similarly worded statute, the Supreme Court directly stated that Title VII is a statutory provision related to the performance of contracts. Patterson v. McLean Credit Union, 491 U.S. 164, 177, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); see also id. at 176-82, 109 S.Ct. 2363.

. Similarly, Senator Rockefeller, who offered the amendment, explained that it was "designed to level the playing field when it comes to employment opportunities for U.S. citizens living in other countries.” 140 Cong. Rec. 565 (1994) (statement of Sen. Rockefeller). The State Department had complained that "discrimination existed because the Foreign Service Act of 1980 did not give foreign affairs agencies the authority to hire Americans residing abroad under the compensation plans used to pay other employees in local-hire positions.” Id. Senator Rockefeller intended that his amendment “give the Secretary of State clear authority ... to pay [Americans] under the same compensation systems used to pay others hired for these positions.” Id. at 566. He believed that his amendment would provide "the flexibility the State Department believes it needs to adjust to the special employment conditions that exist in the hundreds of different Foreign Service posts where these new job opportunities for Americans exist.” Id.
The majority opinion brushes aside those passages of the legislative history because they refer to other statutory amendments as well as to Section 2(c). See Maj. Op. at 1350 & n. 27. But both the Conference Committee and Senator Rockefeller included the amendment to Section 2(c) with the amendments to the Foreign Service Act — suggesting that whatever effect the amendments to the Foreign Service Act were intended to have, the amendment to Section 2(c) was intended to have as well. What was that effect? Greater flexibility for the State Department and a level playing field for Americans working abroad.

. The majority opinion agrees that the Constitution forbids race, sex, and religious discrimination in federal government employment. See Maj. Op. at 1338-39. But the majority opinion expresses doubt whether the Constitution affords remedies to federal government employees who are victims of such employment discrimination. The Constitution does afford such remedies. Courts have long held that citizens facing unconstitutional conduct can seek equitable relief — for an employee facing unconstitutional discrimination, equitable relief could include an injunction prior to termination or reinstatement subsequent to termination. See, e.g., Free Enterprise Fund v. Public Company Accounting Oversight Board, - U.S. -, 130 S.Ct. 3138, 3151 n. 2, 177 L.Ed.2d 706 (2010); Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution”). In the absence of other available remedies, such employees also may have Bivens claims for damages; the Supreme Court has recognized a Bivens remedy in a similar situation. See Davis v. Passman, 442 U.S. 228, 245-49, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (when antidiscrimination legislation did not apply and equitable relief was unavailable, plaintiff alleging employment discrimination on the basis of sex had cause of action for damages under the Fifth Amendment).

. The parties and the majority opinion have addressed this case on an assumption that the ADEA's federal agency provision applies at U.S. embassies in foreign countries. For future reference, I note here that the issue is undecided and that 29 U.S.C. § 633a might not apply extraterritorially. That is because there is a longstanding presumption against the extraterritorial application of statutes. Morrison v. Nat’l Australia Bank Ltd., - U.S. -, 130 S.Ct. 2869, 2878, 177 L.Ed.2d 535 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."). Embassies likely would be considered extraterritorial for these purposes. Cf., e.g., United States v. Gatlin, 216 F.3d 207, 214 n. 9 (2d Cir.2000); McKeel v. Islamic Republic of Iran, 111 F.2d 582, 588 (9th Cir.1983); 1 Oppenheim’s International Law § 499 & n.4 (Robert Jennings & Arthur Watts eds., 9th ed. 1996); Restatement (Third) of Foreign Relations Law of the United States § 466 cmts. a, c (1987); see also Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285-86, 69 S.Ct. 575, 93 L.Ed. 680 (1949); Vermilya-Brown Co. v. Connell, 335 U.S. 377, 383-90, 69 S.Ct. 140, 93 L.Ed. 76 (1948). See generally EEOC v. Arabian American Oil Co., 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991).