620 F.Supp. 977 (1985)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
STATE OF NEW JERSEY, et al., Defendants.
Civ. A. No. 85-2905.
United States District Court, D. New Jersey, Civil Division.
October 7, 1985.
*978 John Edmonds, Reginald Sydnor, Izzie Jenkins, Philadelphia, Pa., for plaintiff.
Irwin I. Kimmelman, Atty. Gen. of N.J. by Jonathan L. Williams, Michael R. Clancy, Deputy Atty. Gen., Trenton, N.J., for defendants.

OPINION
BARRY, District Judge.
The Division of State Police of the State of New Jersey is charged with the basic statutory mission of enforcing the laws of the State of New Jersey and providing services to municipal, county, and federal agencies. Under the leadership of Colonel Clinton L. Pagano, Superintendent of the State Police and, in that capacity, its chief administrative official, 2200 "sworn members" fulfill that mission. Because of its record of accomplishment, this widely diversified state level policing organization has achieved a nationwide reputation.
For more than thirty years, sworn members of the Division of State Police were required to retire at age 55. In 1983, however, the Supreme Court held in E.E.O.C. v. Wyoming, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), that the Age Discrimination in Employment Act of 1967 ("ADEA"), 81 Stat. 602, as amended, 29 U.S.C. §§ 621-634, with its ban on age discrimination against individuals between the ages of 40 and 70, could be constitutionally applied to the states. Consequently, the Attorney General of the State of New Jersey declared the mandatory retirement statute unenforceable as of the March 2, 1983 Wyoming decision because no facts had yet been developed to support the conclusion that the mandatory retirement of sworn members at age 55 was valid under the bona fide occupational qualification (BFOQ) exception to the ADEA. That exception provides that:
It shall not be unlawful for an employer ... to take any action otherwise prohibited ... where age is a bona fide occupational qualification reasonably necessary *979 to the normal operation of the particular business....
81 Stat. 603, 29 U.S.C. § 623(f)(1). The New Jersey State Legislature subsequently repealed the mandatory retirement statute.
Thereupon the Division of State Police, with the legal assistance of the Attorney General, initiated a study to determine whether a factual basis existed to establish an age-specific retirement provision for the State Police under the BFOQ exception. As Colonel Pagano candidly observed, "I didn't even know what a BFOQ was, and very few of my peers knew what a BFOQ was. We were trying to determine whether the age-old standards that had been administered by law enforcement agencies across the country were in fact valid, and were they defensible under the statute."
As part of that study, two cardiologists, two physiologists, and a cardiologist who is also a physiologist were consulted to evaluate the job duties, statutory responsibilities and operational policies of the State Police and determine whether the continued fitness to perform those functions could be determined without reference to age. On the basis of the professional opinions provided to the Division, on December 19, 1984 the Division of State Police issued a Report on the Establishment of a Mandatory Retirement Age as a Bona Fide Occupational Qualification (hereinafter referred to as "BFOQ Report"). That Report concluded that a compelling factual basis exists to believe that all or substantially all persons aged 55 and over are unable to safely and efficiently perform State Police duties, and that it is impossible or impractical to determine the continued fitness of individuals over that age on an individualized basis. As one of the highest ranking members of the Division testified before me, a man, I note, who at 54 years of age would be eligible to replace the 56-year old second highest ranking member of the Division were I to accept the Report's conclusion, this is a "young man's operation".
Following the issuance of the Report, the New Jersey State Legislature held hearings, considered, and subsequently passed a statute establishing the requirement that all members of the State Police, other than the Superintendent, retire as of age 55.[1] The legislation specifically found and declared that retirement at age 55 constituted a BFOQ reasonably necessary to the continued health and fitness of the members of the State Police, and that such ongoing health and fitness was required for the safe and efficient protection of the public.[2] The Governor signed this legislation into law on May 31, 1985, and it will become effective on September 1, 1985. On that date, 62 members of the Division who will have reached the age of 55 will be required to retire absent relief from this court.
The Equal Employment Opportunity Commission ("EEOC")[3] has brought this action naming the State of New Jersey, the State Police, and Colonel Clinton L. Pagano as defendants and alleging that the mandatory retirement statute violates the ADEA. Currently before the court is plaintiff's application *980 for a preliminary injunction which, if granted, would prevent defendants from retiring state police officers at age 55.
It is clear that injunctive relief at a preliminary stage is only appropriate if it has been demonstrated that there exists a reasonable likelihood of eventual success on the merits as well the probability of irreparable injury if equitable relief is not immediately granted. Freixenet, S.A. v. Admiral Wine & Liquor Co., 731 F.2d 148, 150-51 (3d Cir.1984); Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir.1982) (en banc); Kennecott Corporation v. Smith, 637 F.2d 181, 187 (3d Cir.1980). A preliminary injunction must be denied if the moving party fails to satisfy both of these prerequisites. In re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1143 (3d Cir.1982); Eli Lilly & Company v. Premo Pharmaceutical Laboratories, Inc., 630 F.2d 120, 136 (3d Cir.), cert. denied, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). It is also necessary to consider the effect, if any, the requested relief will have on the public interest, as well as the harm, if any, that relief will cause third parties. Oburn v. Shapp, 521 F.2d 142, 151 (3d Cir.1975). Thus, even with the mandatory nature of the likelihood of success and irreparable harm proof requirements, the court must consider whether the "delicate balancing" of all of the factors justifies the entry of interim relief. Glasco v. Hills, 558 F.2d 179, 180 (3d Cir. 1977); Kershner v. Mazurkiewicz, supra, 670 F.2d at 443.
This court has heard 30 witnesses presented and cross examined by skilled advocates over the course of twelve full days of testimony. Numerous exhibits were admitted into evidence and have been carefully reviewed. This court has had the benefit, as well, of the recent clarification by the Supreme Court of the appropriate test for determining whether age-related employment criteria are valid under the ADEA. Western Airlines v. Criswell, ___ U.S. ___, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985); Johnson v. Mayor of Baltimore, ___ U.S. ___, 105 S.Ct. 2717, 86 L.Ed.2d 286 (1985). It has also had the benefit of an even more recent decision of the Court of Appeals for the Third Circuit. EEOC v. Commonwealth of Pennsylvania, 768 F.2d 514 (3d Cir.1985). Based on all that is before it, it is the determination of this court that the application for a preliminary injunction should be denied.

I

THE BFOQ EXCEPTION
Throughout the legislative history of the ADEA, one empirical fact is repeatedly emphasized: the process of psychological and physiological degeneration caused by aging varies with each individual. `The basic research in the field of aging has established that there is a wide range of individual physical ability regardless of age.' As a result, many older American workers perform at levels equal or superior to their younger colleagues. (footnote omitted)
And, thus, the tone was set in Criswell, supra, 105 S.Ct. at 2749.
Noting that "chronological age alone is a poor indicator of ability to perform a job," Id., at 2750 quoting H.R.Rep. No. 95-527, pt. 1, p. 2 (1977), Legislative History 362, the Court observed that "[i]n both 1967 and 1978, however, Congress recognized that classifications based on age, like classifications based on religion, sex, or national origin, may sometimes serve as a necessary proxy for neutral employment qualifications essential to the employer's business." Id. That recognition is reflected, of course, in the BFOQ exception to the ADEA.
Having acknowledged the need for such an exception, the Court was quick to point out the limited scope and application ascribed to it first by the Secretary of Labor, 33 Fed.Reg. 9172 (1968), 29 C.F.R. § 860.102(b) (1984), and later by the EEOC, 46 Fed.Reg. 47727 (1981), 29 C.F.R. § 1625.6 (1984). Id. at 2750-51. Such consistently narrow interpretations, together with the restrictive wording of the statute itself, "convince us that, like its Title VII counterpart, *981 the BFOQ exception `was in fact meant to be an extremely narrow exception to the general prohibition' of age discrimination contained in the ADEA." Id. at 2751, quoting Dothard v. Rawlinson, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977). However, the Court noted that the relevant legislative history indicated that the BFOQ exception was specifically intended to apply

[i]n certain types of particularly arduous law enforcement activity [where] there may be a factual basis for believing that substantially all employees above a specified age would be unable to continue to perform safely and efficiently the duties of their particular jobs, and [where] it may be impossible or impractical to determine through medical examinations, periodic reviews of current job performance and other objective tests the employees' capacity or ability to continue to perform the jobs safely and efficiently. Id. [105 S.Ct.] at 2752, quoting S.Rep. No. 95-493 (1977) at 10-11 (1977), Legislative History 443-333. (emphasis added)
The Court further held that when an alleged BFOQ concerns the public safety, "[t]he uncertainty implicit in the concept of managing safety risks always makes it `reasonably necessary' to err on the side of caution in a close case." Id. 105 S.Ct. at 2754. (footnote omitted).
With that introduction, the Court proceeded to adopt the two prong test for evaluating the BFOQ defense first set forth in Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224 (5th Cir.1976). The first inquiry, said the Court, is directed to the reasonable necessity of the employer's job qualifications to the essence of its business. The qualification of good health for a vital flight crew member was deemed to be reasonably necessary to the safe transportation of passengers, as the need to hire individuals under age 40 who have a low risk of accidents was deemed, in Tamiami, to be essential to the safe intercity transportation of bus passengers. The second inquiry is directed toward whether "the employer is compelled to rely on age as a proxy for the safety-related job qualifications validated in the first inquiry." Id. 105 S.Ct. at 2751 (footnote omitted). The Court continued:
This showing could be made in two ways. The employer could establish that it "had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all [persons over the age qualifications] would be unable to perform safely and efficiently the duties of the job involved...."
Alternatively, the employer could establish that age was a legitimate proxy for the safety-related job qualifications by proving that it is "impossible or highly impractical" to deal with the older employees on an individualized basis. "One method by which the employer can carry this burden is to establish that some members of the discriminated-against class possess a trait precluding safe and efficient job performance that cannot be ascertained by means other than knowledge of the applicant's membership in the class."
Id. at 2751-52 (footnotes omitted).
The Court offered additional guidance highlighting the relevant inquiries under both prongs. With reference to the first prong of the test  reasonably necessary job qualifications  the Court made clear that
The BFOQ standard adopted in the statute is one of `reasonable necessity,' not reasonableness. In adopting that standard, Congress did not ignore the interest in public safety.... When an employer establishes that a job qualification has been carefully formulated to respond to documented concerns for public safety, it will not be overly burdensome to persuade a trier of fact that the qualification is `reasonably necessary' to safe operation of the business.
Id. at 2754.
As to the second prong  whether age is a permissible proxy for a particular job qualification  the Court repeated the appropriate standard:

*982 Unless an employer can establish a substantial basis for believing that all or nearly all employees above an age lack the qualifications required for the position, the age selected for mandatory retirement less than 70 must be an age at which it is highly impractical for the employer to insure by individual testing that its employees will have the necessary qualifications for the job.
Id. at 2756.
With the benefit of the guidance provided in Criswell, the Court of Appeals for the Third Circuit recently considered an ADEA challenge to Pennsylvania's mandatory retirement age of 60 for its state police officers. EEOC v. Commonwealth of Pennsylvania, supra. The district court had determined that Pennsylvania's mandatory retirement age was justified under the BFOQ defense. EEOC v. Commonwealth of Pennsylvania, 596 F.Supp. 1333 (E.D. Pa.1984). While the appeal of that decision was pending before the Court of Appeals, the Supreme Court decided Criswell and Johnson. Accordingly, the court vacated the district court's judgment and remanded the case for reconsideration in light of those cases and, more specifically, for additional factual findings.
If it was unclear before, there is now no doubt that employers seeking to bring their age-based classifications within the "extremely narrow [BFOQ] exception to the general prohibition of age discrimination contained in the ADEA, Criswell, ___ U.S. at ___, 105 S.Ct. at 2751 (quoting Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977)) ... are required to make a `particularized factual showing' with respect to each element of the BFOQ defense. Johnson, ___ U.S. at ___, 105 S.Ct. at 2722." EEOC v. Commonwealth of Pennsylvania, supra, 768 F.2d at 518. See also Orzel v. City of Wauwatosa Fire Dept., 697 F.2d 743, 755 (7th Cir.), cert. denied 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983); Tuohy v. Ford Motor Co., 675 F.2d 842, 844 (6th Cir.1982); EEOC v. County of Santa Barbara, 666 F.2d 373, 376 (9th Cir.1982).
Noting that "the truism that the ability to perform strenuous physical tasks declines with age" is insufficient to satisfy the second prong of the Tamiami test,[4] the Court of Appeals also highlighted the need for a particularized factual finding as to the first prong of the Tamiami test. The court indicated that the district court's apparent assumption "that good health and physical strength are job qualifications reasonably necessary to the essence of the PSP's business" lacked the necessary factual support to establish the first element of the BFOQ defense. EEOC v. Commonwealth of Pennsylvania, supra, 768 F.2d at 518. Thus, even where the essence of an employer's business is safeguarding the public, as here there is no dispute that it is, the reasonable necessity of employing only individuals in top physical condition may not be presumed.
In numerous cases, employers have attempted to meet their burden of proving both elements of asserted BFOQ defenses with varying degrees of success. Decisions are being rendered on applications for preliminary and permanent injunctive relief, on motions for summary judgment, following bench and jury trials, and by reviewing courts after having applied the appropriate standards of review. The decisions are, in a phrase, "all over the lot" with little consistency seen even between cases in which the "essence of the business" appears to be identical. In large measure, of course, this result emanates from the fact-dependent nature of each case with BFOQ's being sustained or rejected because of sufficient or insufficient evidence as to one or both prongs of the Tamiami test.
And yet

*983 It seems somewhat anomalous for the lawfulness of maximum age limits on police hiring to depend on the particular evidence presented at various court trials throughout the country [citations omitted.] Nevertheless, the ADEA accords each person between 40 and 70 the right to challenge an adverse employment decision based on age and thereby obligates each employer to defend such challenges in separate actions, despite the application of the same age limit to similar or even identical occupations in different communities.
Hahn v. City of Buffalo, 770 F.2d 12, 15 (2d Cir.1985).[5]
That there exists the exceptional person who can leap tall buildings in a single bound and run marathons that a person half his or her age cannot contemplate as being within the realm of possibility does not call into question the "truism" that the ability to perform strenuous physical tasks declines with age and one wonders why in each case that common wisdom must be proved. Professional athletes, as a group, are superbly conditioned individuals. Yet has there been a professional baseball player who, in his mid-forties, batted 300 or won 20 games in a season? Has there been a professional boxer who, in those years, won a crown at any weight? Has there been a professional tennis player who won a Wimbledon or a U.S. Open even assuming he or she was not required to be relegated to a "Seniors" category? Allowing for those who did not try because they knew they could not achieve those heights, the names of those who tried and failed  who waited too long before they left  are legion.
And if it did not disturb the Supreme Court that the hiring of busdrivers only under age 40 in Tamiami was essential to safety, should not the retirement of State Police officers age 55 and over be deemed, without more, to be essential to the enforcement of the laws and, therefore, the safety of the public? Somewhere, I suggest, principles akin to stare decisis must set in. But not yet. EEOC v. Commonwealth of Pennsylvania, supra, 768 F.2d at 518 and n. 3.

II

LIKELIHOOD OF SUCCESS ON THE MERITS
It is defendants, not plaintiff, who are likely to prevail on both prongs of the Tamiami test. I note that plaintiff, while arguing that the first prong has not been met, is not seriously suggesting, nor could it, that qualifications of health and fitness are not reasonably necessary to the essence of the business of the State Police or that there is insufficient evidence of that fact and, indeed, I so find. Rather, plaintiff argues that because defendants permit sworn members under age 55 to remain on full duty when certain of them smoke, are overweight, have high blood pressure, and have high cholesterol  all "risk factors"  and permit certain others to remain on "light duty" while recovering from heart attacks, back problems, and other ailments, the importance that defendants purport to attach to health and fitness is called into question. Were the issue that simple, and even if some of the 55 year and older sworn members had some of the same risk factors, which they do, plaintiff might be correct. Similarly, if the State Police was making "no attempt to monitor the health and physical prowess of younger officers, and indeed permits some of them to remain *984 on the job with serious disabilities", EEOC v. Commonwealth of Pennsylvania, supra, 768 F.2d at 518, plaintiff might be correct. As will become clear, however, on both scores it is incorrect.
Moreover, defendants have gone well beyond what is required to satisfy the second Tamiami prong. Defendants' position is that all or substantially all State Police officers aged 55 and over cannot safely and efficiently perform their duties because of diminished aerobic capacity. They also urge this court to find that a large percentage of officers aged 55 and older possess significant, but silent, coronary artery disease which would place themselves and others at risk during the performance of arduous state police duties and that the presence of coronary artery disease of this magnitude cannot be determined among officers over age 55 on an individualized basis except with reference to age. There are ample facts which enable me to say that there is a substantial likelihood that both positions are correct even though, of course, one would be sufficient.

A. Organization and Structure of the New Jersey State Police

The Division of State Police is a uniformed law enforcement agency of the State of New Jersey with approximately 2,200 sworn members serving in nine different operational sections. A multi-faceted public safety agency, it has broad law enforcement and regulatory responsibilities. It performs traditional state-level law enforcement functions, such as uniformed road patrol services on the major thoroughfares of the state, and criminal investigations concerning possible violations of state and, indeed, federal law. In addition, it includes a Criminal Intelligence Services Section, which investigates terrorist and organized crime activities; a Casino Gaming Section, which is involved in regulatory and law enforcement activities concerning the gaming activities in Atlantic City; and an Emergency Management Section, which is responsible for coordinating state-wide responses to major emergencies and natural disasters. The Division of State Police performs, as well, other specialized and technical services, such as equine testing at the state's racetracks and underwater recovery activities by the first underwater recovery unit in the world.
Pursuant to the Rules and Regulations of the Division, all sworn members of the State Police are subject to transfer and reassignment at any time, and are required to be "on call" 24 hours a day for the performance of their duties as needed. Also, pursuant to the Rules and Regulations, all sworn members are required to take appropriate law enforcement action at all times, even while technically off duty or while traveling to and from work, to effect arrests and to assist disabled motorists on the road. Similarly, they are required to provide "back up" support when state or local police officers on the road are in need of assistance. Because officers may drive as many as 30,000 miles a year in their state vehicles, including the commute to and from their posts, officers in all ranks and assignments are commonly required to take law enforcement action.[6]
*985 All sworn members are required to carry a service weapon at all times and to qualify in the use of that weapon at least twice a year. All sworn members also participate in yearly In Service Training Sessions during which they are instructed in basic law enforcement subjects, including current techniques and the legal aspects of search and seizure and arrest. Higher-ranking officers are encouraged as matter of Division policy to assume a command presence in the field, especially in emergencies being handled by subordinate officers. High ranking officers are also required to participate, in uniform, in the Holiday Sobriety Patrols conducted in the field by the Division. In addition, like all other officers, these personnel are subject to reassignment or transfer to any Division position at any time.[7]

B. Importance of Continued Health and Fitness of the Members of the New Jersey State Police

Members of the State Police are required by statute to maintain, to the satisfaction of the Superintendent, their continued physical fitness to perform law enforcement duties. N.J.S.A. 53:1-9. This requirement is reiterated in the Rules and Regulations of the Division, which provide that all officers "shall keep physically fit and be subject to duty at all times, unless otherwise excused on recommendation of a Division physician with the approval of the Superintendent".[8] The continued fitness of sworn members is necessary to the performance of their basic function of enforcing the laws and protecting the public.
Prior to 1983, all officers under the age of 50 were required to participate in an annual physical fitness test, which measured the ability to perform rudimentary physical activities. Following the decision of the United States Supreme Court in EEOC v. Wyoming, supra, the Division suspended this physical fitness test after concluding that it was necessary to take a more realistic look at the health and medical needs of State Police officers, and to establish more complete job-related performance standards. The first step in this process was the development of an In-Service Fitness Screen, which assembled baseline data as to the health and fitness of all sworn members.
This Fitness Screen was developed by the Training Bureau of the Division in consultation with the Division physician and an exercise physiologist and following a review of the literature and of fitness studies performed by other police agencies around the nation. All members of the State Police participated in the Fitness Screen in August-September 1984. A complete personal and medical history was taken from each sworn member as well as his or her blood pressure, resting initial heart rate, height, weight, grip-strength, percentage of body fat, and trunk flexion ability. Finally, all officers with an appropriate initial heart rate participated in the Harvard Step Test, a basic exercise test which provides information as to an individual's work capacity. The results of the Harvard Step Test showed a marked decline in ability to complete that test with age. Moreover, sworn members in the age groups 51-55 and 56-63 comprised the highest percentage of persons unable to complete the screen because of blood pressure problems *986 and a higher percentage of officers between the ages 51 and 55 than in any other age group disqualified themselves at the outset because of an ailment.
The information obtained as part of the In-Service Fitness Screen was used to assist in the establishment in February 1985 of the Well Trooper Program, which requires all sworn members to undergo a complete annual medical examination. The direct cost of performing the examinations for the first year was in excess of $275,000. Pursuant to this program, all sworn members were given complete medical examinations during the period of FebruaryApril 1985 at one of four hospitals throughout the State. These examinations will be continued every year.[9]
At the present time, virtually all of the medical evaluations the result of these examinations have been submitted to the Division's medical unit. Those officers with obvious medical problems have been referred for appropriate medical treatment.
The results of the In-Service Fitness Screen and Well Trooper Program were also shared with the Division Physical Standards Committee, which was established in October 1984. The function of this Committee is to review the physical requirements of State Police job duties and the fitness level of the force in order to propose ongoing job performance and fitness and training standards and goals to replace the very basic fitness test which was suspended in 1983.
The Committee has retained outside consultants and has received an initial recommendation concerning appropriate job performance, fitness and training standards. It is anticipated that the final Committee recommendation will be presented to the Superintendent for appropriate action shortly, and that a program of annual physical performance evaluations will be in place in the near future.
The information obtained from the In-Service Fitness Screen and the Well Trooper Program is also in the process of being reviewed by the Division's Duty Status Review Board, which has been directed by the Superintendent to assist in the formulation of appropriate Division policy with respect to officers with health problems. The Board has begun the process of formally evaluating the fitness and health information regarding all sworn members preparatory to recommending appropriate action to the Superintendent. "Hard decisions" will then be his responsibility to make.
Pursuant to the recommendations of the Duty Status Review Board, a number of individuals have been recommended for a status of less than full duty. Most of those, such as officers recovering from an operation, have been assigned to limited duty status for a temporary period of time. Certain individuals, however, have continuing or permanent disabilities. These individuals include an officer with a leg prosthesis who lost his leg in the line of duty, others with cancer, ten known sufferers of coronary artery disease, and one individual who has had coronary by-pass surgery. Others with continuing disabilities include officers who suffered on-duty injuries, individuals traditionally treated with what is best described as "organizational benevolence."
The Superintendent has stated his intention to consider the status of the members of the force on a case-by-case basis. Those of any age possessing disabilities which impede the safe and efficient performance of their job duties will face involuntary retirement consistent with revised Division policy.
Defendants have made a strong showing that the continued health and fitness of all sworn members of the State Police is reasonably necessary to the essential mission *987 of that agency which, it has been stipulated, is to enforce the laws and protect the public. Mandated by statute and reiterated in the Rules and Regulations of the Division, the importance defendants accord health and fitness is evident from the substantial organizational and fiscal resources they have marshaled to evaluate the physical and medical condition of their work force, establish appropriate job performance and training goals, and identify and take appropriate action with respect to those officers who do not possess the level of fitness necessary to safely and efficiently perform State Police duties. Unlike other organizations which pay scant attention to the health needs of their employees while invoking those needs as the basis of a BFOQ, see Heiar v. Crawford County, Wisconsin, 746 F.2d 1190, 1198-99 (7th Cir. 1984), defendants' efforts are both impressive and credible. Defendants are, therefore, highly likely to prevail on their contention that the continued health and fitness of all sworn officers is reasonably necessary to the business of the State Police.

C. The Decline in Physiological Functions with Age"all or substantially all"

It is undisputed that an individual must possess an adequate level of physiological fitness in order to safely and efficiently perform the job duties of a member of the State Police. In particular, an individual must have a sufficient level of aerobic fitness, an appropriate ratio of fat to lean body mass, muscular strength, and aural and visual acuity and reaction time. All of these functions generally decline, at varying degrees, with age. Overall, the greatest decline in these physiological functions occurs with respect to an individual's aerobic capacity, that is, the ability to take in the oxygen necessary to perform work.
The level at which individuals perform these various physiological functions can be measured, some more easily than others. The primary difficulty in using these physiological measurements to evaluate the ability to perform a job is in relating those measurements to the actual physiological requirements of the job. In the absence of such validation, the measurement of various physiological functions can only give a general idea as to the relative fitness of members of a work force, and cannot be used to evaluate ability, vel non, to perform a job. However, if the level of performance of a particular physiological function required by a job can be ascertained, the inability to attain that level of performance can be used to exclude persons who are unable to perform the job.
The aerobic capacity of individuals can be a useful criterion for identifying persons unable to perform jobs which have a known aerobic requirement and is the physiological criterion on which the parties have concentrated their efforts. "Aerobic capacity" refers to the maximum amount of oxygen which an individual can take in within a given period of time and is also referred to as "VO2MAX". The aerobic capacity of persons at various age groups is well-established in the literature, and the aerobic requirement of many basic physical tasks is known. Accordingly, by comparing the aerobic capacity of particular age groups with the known aerobic requirements of one or more essential State Police tasks, the ability of all or substantially all persons in those age groups to perform State Police duties can be evaluated. More specifically, an individual's aerobic capacity can provide a direct measure of his or her ability to perform certain basic tasks.
There are several ways by which aerobic measurements can be expressed. One way is by "liters per minute", with the aerobic requirements of a task, or the aerobic capacity of an individual, expressed in terms of the absolute number of liters of oxygen utilized per minute. Data for the aerobic capacity of population groups expressed in this manner do not take into account the differing body weights of the persons involved, and instead simply aggregate the absolute "liter per minute" values for those persons. Measurements of the oxygen demand for particular physical tasks expressed in this manner assume that a person *988 of average weight is performing the task.
Because the ability to perform work correlates more directly with the amount of oxygen available per unit of body weight, a more useful way to express the aerobic capacity of individuals and the oxygen requirements of various physical tasks is by the number of milliliters of oxygen used per unit of body weight per minute ("ml/kg/min.") This expression or formula takes into account the differing body weights of individuals, since the "ml/kg/min." figure is obtained by dividing the liters of oxygen per minute taken in by a person by his or her body weight. Accordingly, expressed in this manner, an individual weighing 50 kilograms with a 2.2 liter aerobic capacity will have the same amount of oxygen available per unit of body weight as an individual weighing 70 kilograms with an absolute aerobic capacity of 3.0 liters, that is, approximately 43 ml/kg/min. These two individuals would have the same aerobic capacity in terms of the ability to perform work.
An individual performing at peak exercise will reach his or her VO2MAX within 1.5 minutes. The amount of time he or she can continuously perform work of a given oxygen requirement depends upon the percent of the person's VO2MAX needed to do the job. Individuals can work at their VO2MAX for approximately three or four minutes, can work at 80% of their VO2MAX for approximately 20 minutes, and can work for correspondingly longer periods of time at tasks which require lesser percentages of their maximum aerobic capacity. At the conclusion of that period, the individual will experience total body fatigue, and will be unable to perform any activity until he or she has recuperated and paid off the "oxygen debt". The length of time one can work will also be reduced by heat and cold and other factors which create an added aerobic demand.
For example, an individual with a VO2MAX of 40 ml/kg/min. would be able to do a job requiring 40 ml/kg/min. for only three or four minutes before experiencing total fatigue. The same individual could perform a task with an aerobic requirement of 32 ml/kg/min. for approximately 20 minutes. Thus, to perform a job with a specific aerobic requirement for a sustained period of time, an individual must have an aerobic capacity which is correspondingly higher so that he or she will have the necessary aerobic reserve to finish the job before the onset of fatigue.
Individuals performing at the limits of their aerobic capacity cannot prolong the period during which that activity can be performed by "pacing", since they could only do so by interrupting their activity or performing at a lower level of performance, thus changing the nature of the job involved. One can only "pace" the performance of a task if he or she has a maximum aerobic capacity which is sufficiently greater than the oxygen requirement of the job, thus permitting performance at a lower percentage of aerobic capacity in order to sustain the activity over a longer period of time.
It is crystal clear from the testimony, including the testimony of many troopers, that State Police officers are commonly required to perform at high levels of aerobic activity. They are routinely required to run distances greater than 100 yards and on occasion are required to run up to and in excess of one mile. It is also commonplace for officers to push disabled vehicles considerable distances, and to continuously lift objects of 75 lbs. or more in rescue and other emergency situations. They are also required from time to time to swim for sustained periods in rescue and investigation efforts. The potential for such sustained physical activity is present even in the most "routine" road stop. Indeed, responses to the teletype request of the Superintendent for a description by each sworn member of a physically arduous task performed in the course of his or her duties, expressed in terms of speed, distance, and duration of effort involved, confirm the fact that such activities are performed *989 and the high level of aerobic fitness required for their performance.[10]
The expert testimony I credit in this case makes quite clear that the aerobic capacity required to perform basic law enforcement tasks is 40-41 ml/kg/min., although many activities require a much higher aerobic capacity. 40-41 ml/kg/min. is the minimum capacity needed to perform the more routine and less-demanding physical tasks, and is recommended because it provides the aerobic reserve necessary to perform those activities for the period of time required to safely and efficiently perform State Police duties. This figure corresponds with that set by the California Highway Patrol, the West Virginia State Police, the United States Army, and one of plaintiff's experts.
This minimum figure was disputed by another of plaintiff's experts, however. While conceding that there was an "unquestionable" decline in performance with age, in his view aerobic fitness is the least important of the physiological attributes necessary to perform police duties. His opinion, however, was based upon his knowledge of law enforcement organizations in which the most aerobically demanding task would commonly be a foot chase of 80-100 feet. He had no prior professional contact with the New Jersey State Police before this litigation, and had only reviewed documentary materials and interviewed three officers before rendering his opinion. Importantly, he agreed that if facts supported the job descriptions of the New Jersey State Police, an aerobic capacity of 40 ml/kg/min. level would be appropriate. Similarly, another expert relied upon by plaintiff had no direct knowledge of the New Jersey State Police and conceded that the 2000 teletype responses could provide a basis for establishing a minimum aerobic requirement of 40-41 ml/kg/min.
As noted earlier, aerobic capacity declines with age, and declines more markedly than any other measurable physiological function. Aerobic capacity is generally at its peak at approximately age 20, and declines 35%-40% by age 60 with the rate of decline generally 10% per decade. The same rate of decline is commonly experienced by men and women and, prior to age 55, members of both genders can meet the minimal aerobic capacity of 40-41 ml/kg/min. needed to perform New Jersey State Police duties. Anaerobic power similarly declines 40%-50% from age 20 to age 60.
Figures setting forth the mean aerobic capacity in populations comparable to the New Jersey State Police are well-established in the physiological literature. By examining those figures in light of the minimum aerobic capacity of 40-41 ml/kg/min. considered necessary for State Police duties, it is possible to evaluate the ability of particular age groups to perform the law enforcement duties of the State Police.[11]
*990 At any age, there will be a broad variation in aerobic capacity among individuals within that age group. However, the standard deviation below which 97.5% of the persons in that age group will fall can be statistically determined. By age 55, only 4% to 5% of men will have an aerobic capacity of 40 ml/kg/min.
This decline in aerobic capacity with age cannot be reversed through training. If an individual is not fully trained, his or her aerobic capacity can be increased through a program of regular, vigorous exercise (two or three times a week for at least 20 minutes per session). Such training can generally increase an individual's aerobic capacity by 10%-15% and that level can be maintained over a limited period of time. However, once an individual has increased his or her aerobic capacity to a particular level, it will nonetheless generally decline with age at the same percentage decline as that of a sedentary person.
With sustained professional athletic training, an individual can increase his or her aerobic capacity by as much as 20%. Training at this level, however, would require running approximately 100-120 miles per week. It would also involve a significant degree of risk, as trained athletes experience an injury rate of as much as 40%. Because the ability to successfully achieve such a high level of training is in part genetically determined, not all individuals could achieve this level of improvement in their aerobic capacity even if an appropriate training program was attempted.
Based on the foregoing facts, I conclude that it is likely that defendants will be able to prove that all or substantially all officers aged 55 and over do not have the aerobic capacity necessary to perform the duties of the New Jersey State Police.

D. Incidence of Latent Coronary Artery Disease in State Police Officers aged 55 and Over Cannot Be Detected on an Individualized Basis

It is undisputed that, although it is decreasing, coronary artery disease is a major public health problem in the United States. Approximately 550,000 people die of heart disease each year, and it accounts for more deaths in the United States than all other causes of death combined. One-half of those persons who die of coronary artery disease die suddenly, and approximately one-third of those persons exhibit no symptoms prior to death. Additionally, approximately 1.5 million heart attacks are suffered annually in the United States, and there are approximately 10-20 million persons with asymptomatic, or "silent", heart disease to a clinically significantly degree.
Coronary artery disease begins in childhood and progresses with age with a marked increase in significant coronary artery disease seen in men in their 50's. A white male in the United States aged 55-64 is 80 times as likely to die of heart disease as an individual 25-34 years of age and a healthy male has a 20% chance of suffering a heart attack by age 60. Although mortality from heart disease levels off somewhat after age 60, this is in large part due to the fact that many diseased persons will have died by that age.
A high percentage of individuals aged 55 and over have significant coronary artery disease. One study indicates that as many as 75% of men aged 55 have a coronary artery occlusion, or blockage, of at least 50% in one or more coronary arteries. More recent studies indicate that 40% of males may have at least one occlusion of 75%-100% by age 50-59. Although the prevalence of coronary artery disease has probably declined with the 26.5% decrease in coronary events from 1968-1978, the prevalence of coronary artery occlusion of *991 50% or more is probably no lower than 40%-50% in males aged 55, and might indeed be much higher.
Coronary arteries supply blood to the heart muscle itself. Occlusions of coronary arteries present a health risk because they can prevent the heart muscle from receiving sufficient oxygen to perform adequately. With the onset of coronary artery disease, plaques build up on the artery walls. If this results in insufficient blood reaching a portion of the heart muscle, ischemia, (a deficiency in oxygen supply to the heart muscle) may result and the heart may manifest irregular beats (arrhythmia), rapid and irregular beats (tachycardia), or a quivering of the heart muscle and cessation of normal beating activity (ventricular fibrillation). This can result in a heart attack or sudden death.
A 50% occlusion will not necessarily interfere with the flow of blood to the heart when an individual is at rest. However, studies suggest that an occlusion of 40%-60% may be significant with exercise, when the demands on the heart are correspondingly greater. Occlusions of lesser magnitude are also significant because coronary artery disease can thereafter progress rapidly and unpredictably, a conclusion illustrated by five year mortality figures which indicate that a person with a blockage of 30% has three times the mortality of a person with normal coronary arteries, and a person with a blockage of 30% to 50% has seven times the mortality rate of a person with normal coronary arteries. Although by-pass surgery will not generally be indicated if an individual has only a single coronary artery blockage of 50% or less, an occlusion of this magnitude will frequently be by-passed if it is discovered in the course of surgery to by-pass a more significant occlusion. Additionally, coronary artery occlusion of this degree is important because the degree of obstruction of an artery bears no direct relationship to the likelihood that an individual will experience symptoms of coronary disease and, thus, diagnosis and treatment may never eventuate.
While the parties may quibble over percentages and numbers, none of the foregoing findings, I suggest, would be seriously challenged. Rather, the parties have concentrated their efforts on whether latent coronary artery disease can be detected in individuals aged 55 and older on an individualized basis. I find it more than likely that testing on an individualized basis is impossible or highly impractical.
The only technique which can reliably determine the presence of a coronary artery occlusion of 50% or less in asymptomatic individuals is cardiac catheterization. This is an invasive procedure which involves placing a catheter in the vein of the patient and manipulating the catheter to the location of the coronary artery in order to take diagnostic x-ray pictures. Expensive and uncomfortable, it presents the risks of bleeding from the site of the arterial puncture or arterial cut-down, inducing a coronary event, loss of a limb through inadvertent blood clotting, and even death.
Cardiac catheterization is generally used to evaluate the benefits of surgery in a person already diagnosed as having coronary artery disease. It is never used as a routine diagnostic screening device to ascertain the presence of significant coronary artery disease in asymptomatic individuals, and plaintiff does not urge its use as a screening device here.[12]
Rather, plaintiff argues that the risk of an individual experiencing coronary death, myocardial infarction (heart attack) or angina pectoris (chest pain) over a period of six years can be evaluated through the use of the Coronary Risk Handbook published by the American Heart Association. With the Handbook, the risk of a healthy person experiencing a coronary event within six years can be estimated by evaluating the *992 risk factors of sex, age, cigarette smoking, blood pressure, serum cholesterol, glucose tolerance, and ECG response. The risk ranges from a 0.3% likelihood over six years for a male in the lowest category of risk aged 35, to a 54.5% risk over six years for a male aged 55 in the highest category of risk.
The Handbook does not address the question of the prevalence of coronary artery disease either at the beginning or at the end of the six-year period. The actual prevalence of disease is clearly much higher than the numbers of healthy persons who will experience cardiac difficulty in each age group at the end of the relevant six-year period.
Moreover, the Handbook, by its terms, does not purport to provide a basis for predicting whether a specific individual will experience a coronary event within six years. On the contrary, it specifically cautions that:
The figures given in the tables should be taken only as guides to risk. They are accurate estimates of group experience but not necessarily the experience of any one individual.
Thus, the Handbook cannot be used to ascertain which specific individuals will experience a coronary event within six years, much less which individuals will develop significant, though asymptomatic, coronary artery disease within that time period. Indeed, even at the highest level of risk for a male aged 55, the Handbook can at most suggest that the individual has a 50-50 chance of experiencing a coronary event within six years.
The primary purpose of the Handbook is to serve as a counseling tool to assist health care professionals in alerting individuals to the coronary risk factors which can be changed, and it is widely accepted as an extremely useful tool for that purpose. Accordingly, as a matter of format, the Handbook focuses only on those risk factors over which an individual has some control (smoking, blood pressure, serum cholesterol, glucose intolerance, ECG), and not those which are beyond the individual's control (sex and age).
Examination of the Handbook indicates that the single greatest conventional risk factor faced by an individual aged 35 is the risk of aging to 55. All other risk factors remaining equal, aging to 55 will increase that individual's cardiac risk 12.3 times. In comparison, smoking will increase the 35 year old male's risk no more than 1.7 times; blood pressure no more than 2.9 times; and cholesterol no more than 8.7 times.
Aging to 55 will also increase the absolute risk faced by a male of 35 more than any other single conventional risk factor. More specifically, aging to 55 will increase the percentage risk faced by a 35 year old male in the lowest risk category by 3.4%, while smoking will increase his risk only 0.2%, increasing blood pressure will increase the risk only 0.7%, and higher cholesterol will increase his risk no more than 2.3%.
Plaintiff also presses the evaluation of cardiac response to exercise stress testing as the appropriate technique by which to detect the presence of coronary artery disease in asymptomatic persons on an individualized basis. In this procedure, the activity of the heart is monitored during progressively more difficult exercise, usually on a laboratory treadmill.
The usefulness of the exercise stress test, by itself, to identify those asymptomatic individuals with coronary artery disease is limited. Even with a population of symptomatic persons (individuals known to have coronary artery disease), only 50%-75% will have a "positive" test indicating that they have the disease. Between 25%-50% of symptomatic persons who take an exercise stress test will, therefore, have a "negative" test result, suggesting that they are healthy when, in fact, they are diseased. Similarly, in a population of persons known to be healthy, approximately 10% will have a "positive" test result, suggesting that they have the disease when, in fact, their coronary arteries are perfectly normal.
*993 The predictive value of a "positive" test (that is, the likelihood that a person with a "positive" test will actually have coronary artery disease), and the predictive value of a "negative" test (that is, the likelihood that a person with a "negative" test is healthy), depend upon the prevalence of disease in the population being evaluated. An exercise stress test will identify diseased persons with a "positive" test result 60% of the time, and will identify healthy persons with a "negative" test result 90% of the time. Therefore, in a population with a disease prevalence of 5%, a "positive" test result will have a predictive value of only 24%. In other words, three-fourths of those persons with a "positive" exercise stress testwhich suggests that they have diseasewill actually be healthy. Although a "negative" test result in those circumstances will be correct 97.7% of the time, the persons with a "negative" result will by definition also include 40% of those persons who actually have heart disease. With this disease prevalence, the results of an exercise stress test are of little or no value in identifying specific asymptomatic individuals who, in fact, have coronary artery disease.
The same problems remain even with a higher disease prevalence. Again, when diseased persons are likely to have a "positive" exercise stress test 60% of the time, and healthy persons likely to have a "negative" test result 90% of the time, in a population of 10,000 with a disease prevalence of 50%, 2,000 persons with disease will have a "false negative" test result, indicating that they are healthy when they are, in fact, diseased. Similarly, 500 healthy persons will have a "positive" test, suggesting that they have disease when they are, indeed, healthy. Although a "positive" exercise stress test result in those circumstances would have an 85.7% predictive value, 40% of the persons with a "positive", or abnormal, exercise test result would, in fact, be healthy. Similarly, a "negative" test result would have a 70% predictive value but, again, that figure would not be useful because 2,000 of those persons with a negative test result would, in fact, be diseased. And, as one of plaintiff's experts admitted, the test is both expensive and difficult to administer.
In light of these limits on the predictive value of both positive and negative test results, the exercise stress test, by itself, is not useful in identifying the specific asymptomatic individuals who possess significant coronary artery disease, regardless of the disease prevalence.
The combined evaluation of conventional risk factors and the response of an individual to an exercise stress test, also pressed by plaintiff, has been studied as a means of identifying asymptomatic individuals with a high likelihood of experiencing a coronary event over time. In the Seattle Heart Watch Study, researchers identified a group of individuals with a one-in-three likelihood of experiencing a coronary event in five years, a group which comprised only 1.1% of the total study population. Although the remainder of the population was considered to be at low risk (approximately 1% chance over 5 years of experiencing a coronary event), eighty percent of the total number of coronary events occurred in that low risk group. Even in the 1.1% of the population deemed to be at high risk, two-thirds of those individuals did not experience a coronary event in five years.
The inability to identify asymptomatic individuals with significant coronary artery disease with a combination of risk factors and exercise predictors was further demonstrated in recent studies of United States Air Force pilots. However, unlike the Seattle Heart Watch Study which only considered the manifestation of symptoms over time, all of the pilots studied were catheterized to determine actual disease prevalence. Although 89% of the group considered to be at "high risk" actually had disease, two-thirds of the total number with significant coronary disease were in the group considered to be at "low risk."
The low predictive value of an exercise stress test, either alone or in conjunction with conventional risk factors, is especially important in the context of State Police *994 duties, which require arduous physical activity, often in the presence of the adrenalin response. Studies have indicated that the highly charged context of such activities can induce heart irregularities which cannot be detected in exercise stress testing conducted in the benign context of the laboratory. Thus, the low predictive value of exercise stress testing is exacerbated by the unique conditions of stress which will often accompany the peak exercise required during the performance of State Police duties. Moreover, as one of plaintiff's experts conceded, an untrained individual is 56 times more likely to suffer sudden death during exercise than at rest.
Defendants have presented a strong showing that the prevalence of significant, but asymptomatic, coronary artery disease among members of the New Jersey State Police age 55 and older presents a serious impediment to the continued health and fitness of these officers and, hence, to their ability to safely and efficiently perform their jobs. As a result of the sharp increase in significant coronary artery disease with age, there is a substantial basis for believing that this health risk must be addressed in officers age 55 and older in order to safeguard the health of the officer involved, as well as the safety of members of the public and fellow officers. In evaluating whether plaintiff is likely to succeed in its contention that this health risk does not provide a basis for the valid retirement of State Police officers at age 55, this court must determine whether the presence of significant coronary artery disease can be reliably determined on an individualized basis.
The medical testimony strongly supports the conclusion that it is impossible or impractical on the basis of current medical techniques to determine, among a group of asymptomatic individuals, the specific persons who suffer from "silent" coronary artery disease of a significant nature. Although the evaluation of conventional risk factors, such as smoking, cholesterol and blood pressure, can assist in counseling individuals and enabling them to lessen the risk of suffering a coronary event, and while risk factors do indeed accelerate or exacerbate coronary artery disease, an evaluation of those factors cannot identify the specific persons who will suffer cardiac difficulties, much less those persons who actually have "silent" disease.
Exercise stress testing, either alone or in conjunction with these conventional risk factors, similarly cannot identify the specific individuals with disease. Again, this technique can only identify a small percentage of the population at high risk of suffering a coronary event over time. It cannot be used in lieu of age as a basis for determining which individuals over age 55 can continue to perform State Police duties because it would frequently suggest that individuals who actually have the disease are healthy, permitting them to resume arduous State Police duties. Similarly, it would identify a substantial number of actually healthy individuals as having disease, and thus subject them to possible termination or invasive testing procedures. It is, thus, not possible to rely on exercise stress testing to determine, on an individualized basis, which State Police officers aged 55 and older suffer from significant coronary artery disease.
It is possible to determine with a high degree of accuracy which particular individuals suffer from significant coronary artery disease on an individualized basis through cardiac catheterization. In light of the degree of risk it presents, however, catheterization is not medically acceptable as a routine screening device for determining the presence of significant coronary artery disease in asymptomatic individuals, and plaintiff does not suggest otherwise.
Is, therefore, age an appropriate "proxy" for determining the continued health and fitness of members of the New Jersey State Police? It was demonstrated that the incidence of heart disease increases dramatically with age. An individual aged 55-64 is 80 times more likely to die of heart disease as an individual aged 25-34. Moreover, it was demonstrated that age is the single most important conventional risk *995 factor, whether considered in terms of the proportional increase in risk over time, or the absolute increase in risk in comparison with other conventional risk factors. Indeed, perhaps half of all individuals aged 55 have significant coronary artery disease, and the level of prevalence may be higher. In light of the fact that the presence of significant coronary artery disease cannot practically be determined in asymptomatic persons on an individualized basis, the only alternative to mandatory retirement would be for the State Police to ignore this serious health risk and wait for an older officer to experience a coronary event, possibly in circumstances which would place the officer, fellow officers, and members of the public at risk. It is, therefore, likely that defendants will establishing at trial that the mandatory retirement age of 55 is an appropriate "proxy" for determining the continued fitness to perform New Jersey State Police duties.

III

IRREPARABLE HARM
Given plaintiff's failure to satisfy its burden of demonstrating a reasonable likelihood of eventual success on the merits, this court need not consider the probability of irreparable harm if equitable relief is not granted. It is clear, however, that harm that will be "irreparable" has not been shown.
The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.
Sampson v. Murray, 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974), quoting Virginia Petroleum Jobbers Assn v. FPC, 259 F.2d 921, 925 (D.C.Cir.1958) (emphasis in original). The injury must be of a "peculiar nature", so that compensation in money cannot atone for it. A.O. Smith Corporation v. Federal Trade Commission, 530 F.2d 515, 525 (3d Cir.1976). The fact that the damage might otherwise be "serious or substantial" is unimportant in the absence of proof that it is manifestly irreparable. Glasco v. Hills, supra, 588 F.2d at 181.
A preliminary injunction will normally be inappropriate in employment termination cases. In Sampson v. Murray, the Court held that although the granting of a preliminary injunction was not "wholly foreclosed" in such cases, the plaintiff "at the very least must make a showing of irreparable injury sufficient in kind and degree to override [those] factors cutting against the general availability of preliminary injunctions in Government personnel cases." 415 U.S. at 84, 94 S.Ct. at 950.
The Court accordingly held that deprivation of income for an indefinite period of time and damage to reputation or embarrasment as the result of being discharged did not provide an adequate basis for the entry of preliminary injunctive relief. 415 U.S. at 89, 94 S.Ct. at 952. It based this conclusion on the fact that monetary loss could be adequately compensated in the ordinary course of litigation, and on its belief that "no significant loss of reputation would be inflicted" and that whatever damage in this regard might occur would be fully corrected should plaintiff ultimately prevail on the merits. 415 U.S. at 91, 94 S.Ct. at 953.
The Court noted:
We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found .... We have held that an insufficiency of savings or difficulties in immediately obtaining other employmentexternal factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itselfwill not support a finding of irreparable injury, however severely they *996 may affect a particular individual. 415 U.S. at 92 n. 68, 94 S.Ct. at 953 n. 68. (emphasis added).
The Supreme Court, therefore, concluded that the granting of preliminary injunctive relief would be improper in an employee termination case in the absence of proof that what was presented was a "genuinely extraordinary situation." Id. See also Moteles v. University of Pennsylvania, 730 F.2d 913, 918-19 (3d Cir.), cert. denied ___ U.S. ___, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984).[13] There is no such proof here.
Plaintiff initially posited several difficulties which will face those sworn members who will be mandatorily retired, but the evidence has clearly established that certain of those difficulties are more imagined than real. Thus, all members of the State Police subject to mandatory retirement will receive substantial pensions of up to more than $40,000 annually, with cost of living adjustments made periodically. Pursuant to the State Police retirement system, an officer retiring after 20 years of service receives 50% of final compensation, while an officer retiring after 25 years receives 60% of final compensation, with 1% per year additional thereafter, up to a limit of 70% of final compensation. These pension benefits are in addition to any other income received by the retiring officer, whether through subsequent employment or otherwise. Retired officers are also covered by life insurance at state expense. Any temporary diminution in income is, of course, readily compensable were plaintiff to eventually prevail and does not constitute irreparable harm.
Similarly, while there may be tension and while there may be problems of morale within the Division given that others will have been promoted to the vacated positions, there will be no "inability" to command where sworn members now in positions of command returned to their current or similar positions at some future point in time. Each of the affected officers recognizes the paramilitary structure of the Division with its highly formal chain of command and given that structure, as one put it, "I will command."
The loss of job skills and the difficulty in retraining officers who are out of their positions for a period of time have also been urged upon this court. Any difficulties in these regards and, indeed, any difficulty with reference to the ability to command are, I suggest, more properly raised by defendants. In any event, defendants have represented to the court that they are fully willing to shoulder the burden of retraining officers should plaintiff ultimately prevail so that, if reinstated, those individuals will regain the proficiency necessary to perform their jobs competently. The two officers who testified to a fear of losing their job skills have conceded that they could successfully undergo such retraining. Moreover, any sworn member who is transferred (as he or she can be at any time) to a new substantive area of responsibility would require retraining and retraining is frequently undergone successfully when officers on sick leave return to work. Accordingly, there is no basis for this court to conclude that the loss of job skills during the pendency of this case will present irreparable harm to the officers subject to retirement.
That those who will seek new employment will be unable to find positions utilizing their experience and of equivalent status remains a matter of speculation. This record is replete with examples of officers who have retired from the Division and have gone on to prestigious and responsible positions in law enforcement as well as in other fields. Indeed, officers of the New Jersey State Police are often actively sought by both the private and governmental sectors upon retirement.
Even were one's inability to find a position which he deems suitable sufficient to constitute irreparable harm, and I do not *997 for one moment suggest that it would,[14] there is no evidence that any of the 62 affected officers will be unable to find such a position or that, upon the passage of the statute, any one of them even attempted to do so. Indeed, one officer testified that it was "probable" that he could find a position of appropriate status and responsibility. Be that as it may, whether the affected officers will or will not encounter difficulty in this regard remains a matter of speculation, and speculation does not constitute irreparable harm.[15]
It is the emotional and psychological difficulties which are now and will be suffered by those who are required to retire on September 1st which have, correctly, been the focus of the parties' attention. It is unexceptional, of course, that officers, some or all, may wish to remain. It is also unexceptional and somewhat understandable that those officers feel anxiety, loss of self esteem, and anger.
I say "somewhat understandable" because each affected officer joined the New Jersey State Police with knowledge that he would be required to retire at age 55 and each affected officer had lived under that requirement for a period of up to 30 years when, in March 1983, the statute was declared unenforceable. The "adequate period" of time which plaintiff's psychiatrist deemed important in terms of alleviating feelings of distress upon retirement has certainly been afforded.[16]
It is, therefore, apparent that the evidence presented by plaintiff is no more compelling than that which is regularly presented in a standard employee termination case. Accordingly, and even assuming that older employees present a somewhat special situation, there is simply no basis for concluding under Sampson that any "peculiar" or "genuinely extraordinary" psychological or other harm which could be deemed "irreparable" will be suffered by these officers warranting removal of this case from the general rule precluding the entry of preliminary injunctive relief.

IV

A PRELIMINARY INJUNCTION WOULD ADVERSELY AFFECT THE PUBLIC INTEREST AND THE DIVISION OF STATE POLICE
The entry of preliminary injunctive relief in this case would have an adverse effect on the public interest by presenting a risk of harm to public safety if defendants ultimately prevail in their contention that mandatory retirement at age 55 constitutes a valid BFOQ. Defendants' position, as should by now be clear, is that the mandatory retirement age is necessary because all or substantially all officers over the age of 55 cannot safely and efficiently perform State Police work, and that it is impossible and impractical to determine on an individualized basis, except with reference to age, those persons older than 55 who can safely and efficiently perform those duties. If defendants are ultimately correct in this *998 contention, the retention of officers over the age of 55 during the pendency of this action will present a risk of harm to the individuals involved, to other officers, and to the members of the public they are sworn to protect. It is hardly a startling proposition that a law enforcement organization, and the public it serves, must be able to rely on the physical abilities of its members to perform their duties.
Somewhat related, and yet somewhat different, is the fact that the entry of a preliminary injunction would cause the average age of troopers performing road duty to rise because officers aged 55 and older some, many, or allwould remain on the force. Indeed, the average age of the road trooper has already increased by virtue of the suspension of the prior mandatory retirement statute in March of 1983. This rise in age of those who are on patrol functions day in and day out would make it even more likely that officers with an unacceptably low aerobic capacity or with silent heart disease would be required to perform arduous physical duties which would place themselves and others at risk.
Moreover, preliminary injunctive relief barring the enforcement of the mandatory retirement age would diminish the numbers of higher ranking officers leaving the force, thereby reducing the employment opportunities available to lower-ranking personnel and increasing the likelihood that they will leave. But even were they to remain, the effect on their morale and the effect of morale on productivity and, hence, on the public safety must be considered. As the Superintendent testified, the practical management of a police organization demands that when individuals perform above the norm there must be a reward, and "promotions are it." Promotions have been substantially reduced since the demise of mandatory retirement in 1983 and the perception that there is no opportunity to get ahead has been the most significant "morale breaker" within the State Police. And while the Superintendent does not now perceive a breakdown in productivity, he is concerned that that possibility exists, a possibility which will not eventuate, at least at this juncture, if a preliminary injunction is denied. While promotions and morale have not been offered to support the BFOQ exception, the effect of these factors on the public interest in terms of the grant or denial of a preliminary injunction is not something I can ignore.

V

CONCLUSION
It is, therefore, this court's determination that plaintiff has demonstrated little likelihood of success on the merits. Rather, defendants have made a substantial showing 1) that health and fitness are reasonably necessary to the essence of the business of the State Police which is to enforce the law and protect the public; 2) that all or substantially all State Police officers aged 55 and over cannot safely and efficiently perform State Police duties because of diminished aerobic capacity; and 3) that a large percentage of officers aged 55 and older possess significant, but silent, coronary artery disease which would place themselves and others at risk during the performance of arduous State Police duties, and that the presence of coronary artery disease of this magnitude cannot be determined among officers over age 55 on an individualized basis except with reference to age.
Additionally, plaintiff has not demonstrated irreparable harm were this injunction not to issue and defendants have demonstrated the adverse effect on them and on the public interest if an injunction were to issue.
Accordingly, plaintiff's application for a preliminary injunction is denied.
NOTES
[1] Appointed by the Governor, there exists no requirement that a person occupying the position of Superintendent be a sworn member of the New Jersey State Police. Accordingly, the Superintendent is subject only to the direct control of the Governor and the Attorney General and not, at least in any formal sense, to the Rules and Regulations which govern the activities of sworn members.
[2] The Legislature finds and declares that the public health, safety and welfare requires the ongoing health and fitness of all members of the New Jersey State Police so that they may safely and efficiently protect the public. The Legislature further finds and declares that such continued health and fitness cannot be determined except with reference to age, and therefore finds and concludes that retirement of all members of the State Police at age 55, except [the Superintendent] shall constitute a bona fide occupational qualification which is reasonably necessary to the normal operation of the State Police which qualification the Legislature hereby promulgates and establishes.
[3] The EEOC is an agency of the United States and is charged with the administration and enforcement of the ADEA. Pursuant to that authority, the EEOC initiated an investigation to determine whether there had been compliance with the ADEA and concluded that the mandatory retirement statute was violative of the ADEA.
[4] But see Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 315, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) in which, in the context of an equal protection challenge, the Supreme Court noted: "Since physical ability generally declines with age, mandatory retirement at 50 serves to remove from public service those whose fitness for uniformed work presumptively has diminished with age."
[5] There is little consistency even in the age selected for what one can assume are similar or identical occupations. With reference to those cases which have reached the courts on BFOQS for state police, for example, Massachusetts has set 50 as its mandatory retirement age (Mahoney v. Trabucco, 738 F.2d 35 (1st Cir.1984), cert denied, ___ U.S. ___, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984)); Vermont has set 55 (Galvin v. State of Vermont, 598 F.Supp. 144 (D.Vermont 1984)); and Missouri, Pennsylvania, Illinois and Alabama have set 60 (EEOC v. Missouri State Highway Patrol, 748 F.2d 447 (8th Cir.1984); EEOC v. Commonwealth of Pennsylvania, supra; Popkins v. Zagel, 611 F.Supp. 809 (C.D.Ill.1985); Adams v. James, 526 F.Supp. 80 (M.D.Ala. 1981)). As would be expected, other states that have adopted BFOQ's for state police show a similar lack of consistency.
[6] In Commonwealth of Pennsylvania, supra, the Court of Appeals noted that all members of the Pennsylvania State Police

... regardless of rank, are required to carry guns and to respond with appropriate police action in emergency situations, even when off-duty, and are subject to reassignment to street duties when necessary. 768 F.2d at 517.
Concluding that the Pennsylvania State Police should, therefore, be considered a "paramilitary organization", the Court adopted the test articulated in Mahoney v. Trabucco, supra, i.e. the alleged BFOQ should be considered in the context of the generic "occupation" of police officers required to perform front-line duties, regardless of the present assignment of any particular officer. Id. 105 S.Ct. at 517. The Court held that the district court correctly evaluated the validity of the alleged BFOQ from the perspective of street police duties, even though, as here, some officers served in largely administrative assignments. Id. The facts of this case make clear, the parties agree, that the Division of State Police is a "paramilitary organization" and that plaintiff's likelihood of success on the BFOQ issue must be considered with reference to the generic duties of a State Police officer performing road patrol duties and arduous tasks required in various assignments.
[7] The State Police also has supervisory authority over state law enforcement entities, such as the Marine Police, Capitol Police and Alcoholic Beverage Control Inspectors. However, these law enforcement personnel are not sworn members of the State Police and are not subject to the Rules and Regulations of the Division. Accordingly, they are not required or permitted to carry a service weapon off-duty, have no law enforcement authority while off-duty, are not subject to the requirement of being on call 24 hours a day, and cannot be assigned to any State Police assignment. These categories of personnel are not subject to mandatory retirement pursuant to L. 1985, c. 175.
[8] Consultation with the Division physician is readily available and medical care for illnesses and injuries is provided free of charge under the supervision of the Division physician. All officers who are absent from work as the result of illness for more than two days are required to report to the Division physician. Sworn members may consult the Division physician at any time concerning any in-service medical problem.
[9] New recruits to the State Police are subject to a comprehensive medical examination prior to the commencement of their Academy training. However, no annual medical examinations were performed on sworn members of the State Police until Spring 1985. Such medical examinations had been required by contract as to officers serving in the rank of Trooper and Sergeant since 1974, but had not been performed since funding was not provided by the Legislature.
[10] Representative of the responses are the following:

1. A trooper jumped into a quarry from a ledge 30 feet above the water and, for 15-20 minutes in mid-winter, held a woman up while treading water. When rescue equipment arrived, he tied a rope around her, she was pulled to safety, and he subsequently climbed up a 30 foot rope.
2. A trooper chased suspects for a mile through woods at night in four feet of snow. The chase lasted an hour during which he tripped in many holes hidden in the snow and his weight dropped seven pounds.
3. A trooper chased four suspects down an 80 foot embankment; climbed over a six foot cyclone fence; and, for a total distance of two miles, ran through a swamp, down a dirt road, and up the side of a mountain.
4. A trooper chased a suspect up a ten foot embankment, jumped a four foot high fence, ran through a field covered with three feet of snow, and tackled and wrestled the suspect.
5. Following a motor vehicle accident, a trooper carried a 150 pound highly intoxicated male down a steep rocky terrain to safety.
[11] Because many aspects of police work cannot be simulated in the laboratory, it is not possible to measure the actual aerobic requirements of some law enforcement tasks, although it is possible to test for the minimum 40-41 ml/kg/min. aerobic capacity required for the performance of routine State Police duties with a timed 1.5 mile run. It is impracticable, however, to use this test to evaluate the aerobic capacity of persons aged 55 and older because, as will become clear, it would place them at a significant risk of suffering a coronary event as a result of the prevalence of asymptomatic heart disease in that age group. With reference to aerobic capacity, however, the thrust of defendants' argument has not been addressed to the impracticality of individualized testing. I note, however, very persuasive testimony questioning the accuracy if not the impossibility of any test purporting to measure the unexpected life threatening circumstance requiring explosive action and desperate measures.
[12] The only populations of asymptomatic individuals which have been subjected to diagnostic catheterization have been small groups of United States Air Force pilots who have been required in some circumstances to submit to this procedure as a condition of maintaining flight clearance.
[13] I note in passing that one of the affected officers testified that he was uncertain as to whether he would stay or not; one testified that he might leave anyway but does not wish to be mandatorily retired; one testified that he believed "some" of those affected would want to stay; and several testified that they would stay if they could.
[14] See Sampson v. Murray, supra, 415 U.S. at 92, n. 68, 94 S.Ct. at 953 n. 68. See also Ekanem v. Health and Hospital Corporation of Marion County, 589 F.2d 316, 321 (7th Cir.1978) in which the court, citing Sampson, concluded that inability to obtain other employment is not irreparable harm because a terminated employee has an adequate remedy at law.
[15] Plaintiff offered testimony of an occupational analyst concerning the employment prospects of members of the State Police forced to retire as of September 1, 1985. That expert, however, apparently only considered jobs in comparable law enforcement positions as appropriate alternatives for retired members of the New Jersey State Police, rather than other high-level positions in the government and private sectors. He conducted no review of the employment situation in New Jersey, nor did he review the employment experience of recently retired members of the New Jersey State Police, although he conceded that this would be "important". I accord his testimony little weight.
[16] After having stressed on direct examination that individuals who prepare and plan for retirement have the least difficulty going through the experience, this expert was asked on cross examination for the point in time when one who has for years been watching others retire begins to plan for his own retirement. "Well," came his astounding response, "here no one has retired at 55 before".