

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-19-2001

# Dungan v. Secretary Transp

Precedential or Non-Precedential:

Docket 00-1128

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Dungan v. Secretary Transp" (2001). *2001 Decisions*. Paper 52.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/52

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 19, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1128

DEAN DUNGAN,
        Appellant

v.

RODNEY E. SLATER, SECRETARY, UNITED STATES OF
AMERICA DEPARTMENT OF TRANSPORT ATION; JANE
GARVEY, ADMINISTRATOR, UNITED ST ATES OF
AMERICA FEDERAL AVIATION ADMINISTRA TION

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-cv-2376
District Judge: The Honorable Raymond J. Broderick

Submitted Under Third Circuit LAR 34.1(a)
March 13, 2001

Before: MANSMANN, BARRY, and COWEN
Circuit Judges

(Opinion Filed: March 19, 2001)

Duane D. Werb, Esquire
Werb & Sullivan
300 Delaware Avenue, 10th Floor
P.O. Box 25046
Wilmington, Delaware 19899

Joseph M. Lamonaca, Esquire
Suite 303
G & M Building
Chadds Ford, Pennsylvania 19317

   Attorneys for Appellant

Annetta F. Givhan, Esquire
Assistant U.S. Attorney
Office of the United States Attorney
615 Chestnut Street
Philadelphia, Pennsylvania 19106

Marleigh D. Dover, Esquire
U.S. Deputy Attorney General
Room 3127
United States Department of Justice
10th & Pennsylvania Avenue, N.W.
Washington, D.C. 20530

William A. Rivera, Esquire
U.S. Deputy Attorney General
United States Department of Justice
Federal Programs Branch
901 E Street, N.W.
Washington, D.C. 20004

   Attorneys for Appellees

OPINION OF THE COURT

BARRY, Circuit Judge:

Dean Dungan appeals from the District Court's grant of summary judgment to all defendants in an action in which Dungan alleges that the defendants discriminated against him on the basis of age and violated his constitutional rights to due process and equal protection. Because we

2

agree with the District Court that Dungan's complaint did not state a cause of action under either the Age Discrimination in Employment Act, 29 U.S.C. S 621 et seq., or the Fifth Amendment, we shall affirm the judgment of the District Court.

BACKGROUND

Dungan began working as an air traffic contr oller (ATC) in 1974. ATCs at major airports in the U.S. ar e employees of the Federal Aviation Administration (F AA), an agency of the Department of Transportation (DOT). Like all ATCs who were hired between 1972 and 1987, Dungan was a member of the Civil Service Retirement System (CSRS). 5 U.S.C. S 8301 et seq. The CSRS requir ed that an ATC "shall be separated from service on the last day of the month in which he [or she] becomes 56 years of age." 5 U.S.C. S 8335(a). The Secretary of Transportation, however, was given the discretion to permit an A TC "having exceptional skills and experience" to work until age sixty one. Id. The CSRS compensated ATCs for this early mandatory retirement by providing them with mor e generous benefits than were received by other federal employees.1

In 1981, thousands of ATCs who were members of the Professional Air Traffic Controllers Organization (PATCO) went on strike. Dungan did not join this strike. The striking PATCO members were fired by President Reagan, who barred them from working in any positions with the FAA. In August 1993, President Clinton issued an or der permitting the former strikers to be rehired as ATCs. Some undetermined number of former PA TCO members have been rehired.

_____

1. For example, an ATC with twenty years of service was permitted to retire with a pension at age fifty, 5 U.S.C. S 8336(e), while most federal employees would have to achieve age sixty befor e being given a pension after twenty years of service. 5 U.S.C. S 8336(b). Similarly, ATCs were guaranteed a minimum pension payment of 50% of their average salary. 5 U.S.C. S 8339(e). Thus, an ATC r etiring after twenty years of service would receive a 50% pension, much more generous than the 36.25% that would be received by a federal employee governed by the general rules. 5 U.S.C. S 8339(a).

In 1987, Congress adopted the Federal Employee Retirement System (FERS), 5 U.S.C. S 8401 et seq., which replaced the CSRS for many employees, including ATCs, hired after that point. While the FERS changed the retirement scheme for federal employees in many ways, the change most relevant to this case is that it modified the mandatory retirement age for ATCs. Under the FERS, an ATC is not required to retire until reaching twenty years of service or age fifty-six, whichever came later. 5 U.S.C. S 8425(a). Thus, an ATC who entered service after age thirty-six would be permitted to work past age fifty-six. The FERS continued to give the Secretary of Transportation the discretion to allow an ATC to work until reaching age sixty-one. Id. The retirement of ATCs who were hired before 1987 continues to be governed by the CSRS, although they were given opportunities to change their enrollment from the CSRS to the FERS. Similarly, PATCO members who had been covered by the CSRS and were rehired after President Clinton's order in 1993 were permitted to choose between the two retirement programs. It is undisputed that some of the rehired PATCO ATCs are being permitted to work past age fifty-six.

On June 15, 1998, well before his fifty-sixth birthday, Dungan wrote to his division manager seeking a waiver of the mandatory retirement age so that he could work until age sixty-one. Pursuant to the statutory grant of authority contained in 5 U.S.C. S 8335(a), the Secretary of Transportation had delegated authority to grant such waivers to the Administrator of the FAA. 49 C.F.R. S 1.45(a). The Administrator has adopted an internal procedure under which any waiver request must be reviewed by several intermediate officials before being considered by the Administrator and the Secretary. If any one of those intermediate officials does not approve the request, it is automatically denied. In October 1995, the FAA announced that for the foreseeable future, requests for waivers would not be forwarded to the Administrator, effectively cutting off any possibility of seeking an extension past the mandatory retirement age. Consistent with this policy, Dungan's waiver request was denied by the regional manager.

On May 7, 1999, Dungan filed a four-count complaint in the District Court. Count I alleged that the Secretary

4

violated the Age Discrimination in Employment Act (ADEA) by requiring Dungan to retire at agefifty-six while allowing other ATCs to work past age fifty-six. In Count II, Dungan contended that the Administrator violated the ADEA by refusing to submit Dungan's waiver request to the Secretary. In Count III, Dungan claimed that the Secretary violated his Fifth Amendment rights to due pr ocess and equal protection by refusing to consider his waiver request and by forcing him to retire at agefifty-six while allowing other ATCs to work past that age. Finally, Count IV alleged that the Administrator violated Dungan's due pr ocess rights by refusing to forward his waiver r equest to the Secretary. Although this complaint was styled as a class-action, the District Court held all class-related decisions in abeyance until motions to dismiss or for summary judgment could be considered.

On February 24, 2000, the District Court granted defendants' motion for summary judgment on all counts. In a twenty-three page opinion, the District Court determined that the ADEA did not apply to ATCs, that Dungan had no due process right to have his waiver request considered by the Secretary, and that the differ ent retirement ages for different ATCs were rationally related to a legitimate government purpose and did not violate Dungan's right to equal protection. The District Court and this Court both subsequently denied Dungan's requests for injunctive relief to prevent his termination while his appeal was pending.

In March 2000, Dungan reached age fifty-six. Under the provisions of the CSRS, he was requir ed to retire at the end of that month. Apparently, however, he did not timely receive the required sixty-day notice of termination, and he was permitted to work until June 30, 2000. 2

DISCUSSION

On appeal, Dungan disputes the District Court's resolution of each of his claims. He also asserts that the

_____

2. Although there is no evidence in the r ecord before this Court, we assume that Dungan received the requir ed notice on or before May 2, 2000.

District Court erred by not providing him with the pre-trial procedures mandated by the local rules of the Eastern District of Pennsylvania, and by not deciding the issue of class certification.

A. ADEA Claims

In evaluating Dungan's ADEA claims, the District Court noted that while the federal government had been made subject to the act in 1978, see 29 U.S.C.S 633a(a), Congress still reserved the power to statutorily impose mandatory retirement ages that would otherwise conflict with the ADEA. Johnson v. Mayor and City Council of Baltimore, 472 U.S. 353, 357 (1985). Thus, the District Court properly held that the provision of the CSRS requiring ATCs to retire at agefifty-six did not violate the ADEA.

Dungan argues, however, that he is not disputing the validity of the mandatory retirement age, but is instead challenging the fact that other ATCs, and in particular the rehired PATCO members, ar e being allowed to work past age fifty-six. This argument overlooks the fact that the mandatory retirement age of all ATCs is dictated by legislation properly enacted by Congress, regardless of whether the ATCs in question are members of the CSRS or the FERS. It would be paradoxical for this Court to hold that the FAA does not violate the ADEA when it requires an ATC to retire at age fifty-six under the rules of the CSRS, but does violate the ADEA when it permits an A TC to work past age fifty-six consistent with the dictates of the FERS.

Because Congress explicitly authorized both mandatory retirement programs complained of by Dungan, they are outside the scope of the ADEA. On that basis, the District Court properly granted summary judgment to the defendants on Counts I and II of Dungan's complaint. Because this determination is dispositive of the issue, we shall not discuss the alternative grounds for summary judgment offered by the District Court.

B. Equal Protection

Dungan also contends that the Secretary has violated his Fifth Amendment right to equal protection by forcing him to

retire at age fifty-six while allowing other ATCs to work past that age. In particular, he claims that the r ehired PATCO members are being given unconstitutional pr eferential treatment because they are allowed to work past age fifty-six.3 Because the different treatment that Congress mandated for different ATCs is rationally r elated to a legitimate government purpose, it does not violate the Fifth Amendment.

If federal government action creates distinctions between classes of people, and that action does not imper missibly interfere with fundamental constitutional rights or burden a suspect class, that action does not violate the Fifth Amendment so long as it is rationally related to a legitimate government purpose. Massachusetts Boar d of Retirement v. Murgia, 427 U.S. 307, 312-13 (1976). Ther e is no allegation in this case that the differing treatment of ATCs under the two retirement systems interfer es with any fundamental right. Further, the Supreme Court has determined that classifications based on age do not burden a suspect class. Murgia, 427 U.S. at 313-14. In the pr esent case, the two retirement systems are best seen as creating a distinction based on the particulars of individuals' employment, because the question of whether an ATC will be permitted to work past age fifty-six is determined entirely by the retirement system in which he or she is enrolled. Vance v. Bradley, 440 U.S. 93, 97 n.10 (1979) ("Since the age factor is present in both groups, the gravamen of appellees' claim [is that the statute] discriminates on the basis of job classification").

The distinction created between two groups of ATCs by the CSRS and the FERS is clearly rationally r elated to a legitimate government purpose. The adoption of the FERS altered the method of calculating annuities for retired

_____

3. It is clear from the briefs and fr om the record that Dungan feels a great deal of indignation over what he per ceives as the preferential treatment being given to the former strikers. In 1981, Dungan chose to obey the law and refused to join the PA TCO strike. Now he has been forced to retire at age fifty-six while some ATCs who, in his view, broke their faith with the FAA are being allowed to work past that age. It is understandable that he feels anger and frustration, but the law can provide no relief.

7

ATCs, and had the effect of reducing the annuity to which an average ATC would be entitled.4  In that context, it is perfectly logical that Congress would choose to grant every ATC an opportunity to earn at least twenty years of service credit, even if that meant letting some A TCs work past age fifty-six. It is also logical that Congress would choose not to force ATCs who were enrolled in the CSRS to transfer to the FERS, which for some ATCs would have the ef fect of retroactively reducing benefits. Instead, it permitted ATCs covered by the CSRS to select the plan in which to enroll. Regardless of Congress's precise motives, the Supreme Court has noted that federal retirement systems "are packages of benefits, requirements, and restrictions serving many different purposes. When Congr ess decided to include groups of employees within one system or the other, it made its judgments in light of those amalgamations of factors." Vance, 440 U.S. at 109.

Dungan's claim that the rehired PA TCO members are being given some kind of impermissible pr eference also fails. It is true that when the PATCO members were fired, they were subject to the mandatory retir ement age of the CSRS, as was Dungan. When they were rehir ed, however, they were permitted to select between the two plans. Dungan had been given this same choice in 1987. 5 Because some of these rehired ATCs elected to be enrolled in the FERS and because they had fewer than twenty years of service at age fifty-six, they are being allowed to work to an older age than they would have had they never gone on strike. This difference is caused not by their status as strikers, however, but because they had a br eak in service. An ATC who had a similar break in service for other reasons would have received the same benefit.

_____

4. Thus, as noted earlier, under the pr ovisions of the CSRS, an ATC eligible for retirement after twenty years would receive a guaranteed 50% pension, 5 U.S.C. S 8339(e), while under the FERS the same ATC would receive only a 34% pension. 5 U.S.C. S 8415(d). Of course, it is possible that Social Security and voluntary Thrift Savings Plan benefits would compensate for this difference.

5. As the District Court noted, even if Dungan had elected to enroll in the FERS, he would have been forced to r etire at age fifty-six because he already had twenty years of service.

8

The Administrator and the Secretary are r equired to impose different mandatory retir ement schemes on different ATCs due to a legislative mandate. Because that mandate is rationally related to a legitimate gover nment purpose, it does not violate Dungan's right to equal protection.

C. Due Process

Dungan's last substantive claim is that the Administrator and the Secretary denied him his Fifth Amendment right to due process by denying his request for a waiver from the mandatory requirement provisions of the CSRS. This argument fails because Dungan had no pr operty interest in, or legitimate expectation of, a waiver of the mandatory retirement rules.

Before any process is due under the Fifth Amendment, a claimant must demonstrate that there has been a deprivation of an interest in life, liberty, or property. Matthews v. Elderidge, 424 U.S. 319, 332 (1976). There is generally not a property interest in continued public employment unless a claimant can demonstrate a "legitimate claim of entitlement to it." Board of Regents v. Roth, 408 U.S. 564, 577 (1972).

Dungan cannot maintain that he had any legitimate expectation to continued employment as an ATC past age fifty-six, or even any expectation that his waiver request would be submitted to the Secretary. The gover ning statute states that the Secretary "may exempt" an ATC from mandatory retirement. 5 U.S.C. S 8335(a). This clearly indicates that the decision as to whether to grant a waiver is discretionary. Further, the Secr etary is empowered to make this decision "under such regulations as he [or she] may prescribe." Id. The regulations that have been adopted require that an application be appr oved at every level before it is submitted to the Administrator and the Secr etary. Lack of approval at any level functions as a denial of the application. The decision that no waiver requests would be approved was clearly within the discretionary power of the Secretary. Dungan claims that the refusal to consider his request was arbitrary and capricious, but he overlooks the fact that the Secretary is not requir ed to consider any waiver request. In fact, the evidence shows that rather than

9

being arbitrary and capricious, the refusal to consider requests has been consistently applied since the policy was announced in 1995 and that no waivers have been granted since that time.

Because Congress granted broad discr etion to the Secretary to make decisions about waivers, Dungan had no property interest in receiving a waiver or even in having his request considered by the Secretary. In the absence of such a property interest, no process was due under the Fifth Amendment and Dungan's constitutional rights wer e not violated.

D. Pre-Trial Procedur es

Finally, Dungan claims that the District Court err ed by refusing his request for certain pr e-trial procedures and by not making any class-related decisions. Because we will affirm the grant of summary judgment on the merits, we need not consider this argument.

CONCLUSION

For the foregoing reasons, the judgment of the District Court will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

10